# IN RE LEAH S.*
## (AC 25903)

Bishop, Harper and Hennessy, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 18—officially released June 13, 2006

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellant (petitioner).

*Susan B. Carr*, for the appellee (respondent mother).

*David E. Cosham*, for the appellee (respondent father).

*Kevin E. Dehghani*, for the minor child.

*Opinion*

BISHOP, J. The petitioner, the commissioner of children and families (commissioner), appeals from the judgment of the trial court finding her in contempt for wilful failure to comply with the court's orders. On appeal, the commissioner claims that the court improperly held her in contempt because (1) the orders were

ambiguous and (2) the court's finding of contempt was unsupported by the evidence. We affirm the judgment of the trial court.

The record reveals the following troubling factual and procedural history. On April 11, 2003, the commissioner filed an ex parte motion for temporary custody of Leah and her brother following allegations that Leah's parents had abused and neglected their three children.[1] The commissioner based the motion for temporary custody of Leah, in part, on the determination that Leah's parents had "failed to follow through with the recommended treatment services for Leah in that they refused to follow through with counseling services, recommended medication, and other services offered by the [d]epartment [of children and families] to assist them with appropriate parenting skills [and] failed to ensure the children's safety in the home."[2] In sum, the commissioner alleged that Leah's parents failed to cooperate with the physicians' recommendations and those of the department of children and families (department) despite Leah's extensive mental health history.[3]

On April 11, 2003, the court granted the commissioner's ex parte motions for temporary custody of Leah

[1] Leah and her two siblings were taken from their parents on April 9, 2003, and the commissioner placed a ninety-six hour hold on the children. While Leah's sister was returned to the family pursuant to an agreement between the parties, Leah and her brother remained in the temporary custody of the commissioner. Leah's brother was subsequently returned home, pursuant to an agreement reached between the parties in May, 2003. See footnote 4.

[2] The commissioner also alleged that Leah's parents physically and emotionally abused their children, as well as subjected their children to cruel punishment.

[3] Leah's mental health history included her diagnosis of dysthymic disorder, attention deficit hyperactivity, attention adjustment disorder and bipolar disorder, her placement in psychiatric clinics in 1999 and 2000, and her outpatient status at another clinic in 2000. The commissioner claimed that Leah's parents continued to refuse to provide Leah with recommended services even after her "out of control" behavior caused them to file a "Family With Service Needs Petition," in October, 2002.

and for a psychological evaluation of Leah and her family. Additionally, the court ordered the department to implement seven specific steps regarding its care of Leah. The order stated in relevant part: "[The department] is ordered to: 1. Take all necessary measures to ensure the child(ren)'s safety and well being. 2. Provide case management services. . . . 4. Refer the Respondent to appropriate services . . . and monitor his/her progress and compliance."

Before the preliminary hearing on the order of temporary custody, the department had removed Leah from two different foster homes following complaints from her foster parents that she had been aggressive toward other children in the household and destructive of property. In response, the department provided Leah with emergency psychiatric in home services from the Wheeler Clinic twice per week and prescribed medication. Additionally, the department scheduled her for a psychiatric examination.

On May 9, 2003, Leah's parents and the department reached an agreement, through which Leah's parents consented to the commissioner's temporary custody of Leah.[4] On that day, the court again ordered the department to take specific steps to provide for Leah's needs. These steps were a reiteration of the specific steps ordered by the court on April 11, 2003.

On May 14, 2003, in accordance with its procedures, the department conducted a multidisciplinary screening of Leah. The screening process took into consideration

---

[4] The hearing regarding temporary custody commenced April 17, 2003, and was continued to April 25, 2003. On April 25, 2003, the parties waived the ten day hearing on the order of temporary custody, and the matter was continued until May 9, 2003. On May 9, 2003, the parties reached an agreement, through which they waived their right to a contested hearing on the order for temporary custody as to Leah. See General Statutes § 46b-129 (d) (4). In exchange, the commissioner agreed that the court's order of temporary custody as to Leah's brother would be vacated.

Leah's extensive mental health history, including a diagnosis of bipolar disorder and a behavioral and treatment history, which included incidents of violent and destructive behavior and previous psychiatric hospitalizations.[5] The screening report also reflected an awareness of Leah's mental health issues and her history of violent behavior while in the care of the department. Additionally, the report noted Leah's suicidal and homicidal ideation, her arrest for assaulting her two year old foster sister, her lack of memory of her violent behavior, the fact that Leah's foster mother slept in the hallway because she feared that Leah would hurt her children and Leah's daily migraine headaches, which appeared to correlate to her bouts of violence. The social worker conducting the screening recommended that Leah be placed in either therapeutic foster care or in a residential facility given her "psychiatric history, aggression and [f]oster [m]other's concerns for the safety of her children . . . ." Finally, the report contained the notation that the department planned to place Leah in a therapeutic foster home or residential facility following her psychiatric evaluation, scheduled for May 20, 2003.

In June, 2003, however, with no residential placement forthcoming from the department, Leah remained in a nontherapeutic foster home. Instead of a residential placement, the department arranged for Leah to go to the Wheeler Clinic twice a month for counseling sessions to address her lying and violent behavior toward animals, young children and property. Although the Wheeler Clinic also provided monthly medication management services to Leah, the department did not arrange for Leah to receive psychiatric treatment for her underlying mental illness.

---

[5] The screening report noted that Leah was hospitalized twice in 2000 and 2002, and received outpatient psychiatric treatment during the time period of 1997 to 2000.

By September, 2003, Leah's third foster parent requested that the department remove Leah from her care because she "felt that she was not receiving enough support to maintain Leah in her home." In response, the department moved Leah into her fourth nontherapeutic foster home. Within one week, Leah's fourth foster parent reported similar incidents of Leah's disruptive behavior, including yelling and screaming and aggressive conduct toward the family's cat.

On October 3, 2003,[6] the parties reached an agreement concerning the neglect petition the commissioner had filed as to Leah. Under the agreement, Leah's parents entered pleas of nolo contendere to allegations that Leah was uncared for because they had failed to address her specialized needs. The court committed Leah to the custody of the commissioner and ordered the department to comply with the specific steps first ordered in April, 2002. The court also ordered the department to "facilitate counseling between Leah [and her brother] to resolve sibling difficulties."

On October 13, 2003, the Wheeler Clinic recommended Leah for residential placement.[7] Nevertheless, Leah remained in the nontherapeutic foster home, waiting for a space to open in a residential facility. During this period, the department's records documented Leah's deterioration in foster care, the fact that she was overmedicated, the absence of a close relationship between Leah and her family, and the social workers' recommendation that Leah be moved to a safe house

[6] The parties returned to court on October 3, 2003, for a neglect trial regarding Leah and her brother.

[7] This recommendation came six months after the commissioner took custody of Leah and five months after Leah's initial screening revealed her need to be placed in a therapeutic foster home or residential facility. The recommendation documented Leah's escalating and continuous disruptive, aggressive and violent behavior while in the custody of the commissioner, her inability to control herself, and allegations from one foster parent that the department's inadequate support made her unable to continue to care for Leah.

or shelter until a more suitable placement could be made.[8] Despite these reports, Leah remained in the non-therapeutic foster home. There is no evidence in the record that any additional services were offered to the foster parents who were given the responsibility to care for Leah.[9]

On November 21, 2003, the respondent mother filed a motion that the commissioner be adjudged in contempt for noncompliance with the court orders regarding the department's care of Leah. In her motion, the respondent mother alleged that the department,[10] over the past seven months, had failed to provide the services outlined in the specific steps mandated by the court and that the department had delayed the reunification of the family. Following evidentiary hearings on the motion for contempt, the court by memorandum of decision filed September 30, 2004, found the commissioner in contempt and ordered her to pay $500 to the respondent's mother to assist with attorney's fees.[11]

The court found that despite Leah's "unmistakable and urgent" needs, the department failed to implement the specific steps ordered by the court in April, May and October, 2003. In particular, the court found that the department did not comply with the order that the department take all necessary measures to ensure

---

[8] The respondent mother, through her counsel, also sent a letter to the department regarding her concerns that Leah was overmedicated and was not receiving sufficient treatment and support in the foster home.

[9] The commissioner alleges that in October, 2003, she made a foster and adoptive support team program referral and implemented the services in Leah's foster home by November, 2003. Our review of the record, however, disclosed no such referral, recommendation or evidence of such services before the filing of the motion for contempt.

[10] The respondent mother filed three motions on November 21, 2003, a motion for contempt, a motion for services and a motion to revoke commitment.

[11] Evidentiary hearings on the motion for contempt were held on December 19, 2003, February 5, 11 and 23, 2004, and April 13 and September 30, 2004.

Leah's safety and well-being because it failed to seek a residential placement for Leah, and to provide Leah with psychiatric care for her serious mental illness and her persistent headaches. The court also found that the department failed to comply with the order requiring the department to provide case management services because it failed to offer Leah's parents training to assist them in managing children with mental health issues, and the department failed "to develop and implement a coordinated, systematic and comprehensive treatment modality" to assist in the reunification of the family.

In addition, the court found that the department's failure to provide Leah's parents with training to assist them in addressing the mental health needs of their children constituted a failure to follow the specific step ordered by the court that the department refer the respondents to the appropriate services. Finally, the court found that the department's failure to take any action to facilitate counseling between Leah and her brother constituted a violation of its October, 2003 order that the department "facilitate counseling between Leah and [her brother] to resolve sibling difficulties." This appeal followed.

I

First, the commissioner claims that she cannot be found in wilful contempt of the court's orders because the orders were ambiguous. Specifically, the commissioner argues that the specific steps were "too uncertain and indirect to give" a reasonable person notice of what was required to ensure compliance. We disagree.

We begin our analysis by addressing the appropriate standard of review. "Contempts of court may be classified as either direct or indirect, the test being whether the contempt is offered within or outside the presence of the court." (Internal quotation marks omitted.) *Legnos* v. *Legnos*, 70 Conn. App. 349, 352, 797 A.2d

1184, cert. denied, 261 Conn. 911, 806 A.2d 48 (2002). The department's failure to comply with the court's orders constituted indirect contempt because it occurred outside of the presence of the court.

"[A] finding of indirect civil contempt must be established by sufficient proof that is premised upon competent evidence presented to the trial court in accordance with the rules of procedure as in ordinary cases. . . . A finding of contempt is a factual finding. . . . We will reverse that finding only if we conclude the trial court abused its discretion." (Internal quotation marks omitted.) Id., 352–53.

"In order to constitute contempt, a party's conduct must be wilful. . . . The contempt remedy is particularly harsh . . . and may be founded solely upon some clear and express direction of the court. . . . One cannot be placed in contempt for failure to read the court's mind." (Citation omitted; internal quotation marks omitted.) *Sablosky* v. *Sablosky*, 258 Conn. 713, 718, 784 A.2d 890 (2001). Although a good faith dispute or misunderstanding over the terms of an obligation may prevent a "finding of wilfulness as a predicate to a judgment of contempt . . . [w]hether it will preclude such a finding is ultimately within the trial court's discretion. [Also, it] is within the sound discretion of the court to deny a claim for contempt when there is an adequate factual basis to explain the failure to honor the court's order." (Internal quotation marks omitted.) Id.

Nevertheless, it is axiomatic that, to the extent that one subject to the court's orders does not fully understand his or her obligation pursuant to the orders, it is incumbent on that person or entity to seek clarification of the court's orders. As our Supreme Court stated in *Sablosky*, "where there is an ambiguous term in a judgment, a party must seek a clarification upon motion . . . . The appropriate remedy for doubt about the

meaning of a judgment is to seek a judicial resolution of any ambiguity . . . ." Id., 720. "A different conclusion would . . . encourage parties to refrain from seeking clarifications of ambiguous court orders. The doors of the courthouse are always open; it is incumbent upon the parties to seek judicial resolution of any ambiguity in the language of judgments." (Citation omitted; internal quotation marks omitted.) Id., 722.

In applying these general tenets to the case at hand, we observe, at the outset, that if, in fact, the commissioner was uncertain as to the court's mandates concerning the care of Leah, it was the commissioner's responsibility to seek clarification and further direction from the court. Although the contempt finding at issue in *Sablosky* arose in the context of a marital dissolution matter, its teaching is particularly applicable to an agency of the state that is entrusted with a ward of the state. In this context, the commissioner's obligation flows primarily from her assumed parental role over Leah. When the state intervenes in the care of a minor to supplant the role of parents, the state's chief obligation is to provide for the child's physical and emotional well-being. In this enterprise, the court acts on behalf of the people of Connecticut in directing the appropriate state agency's conduct.

Here, in committing the child to the care of the commissioner, the court ordered the department to undertake specific steps to ameliorate the child's condition and to make her safe. In seeking and accepting the child's charge, the commissioner acted as a fiduciary to the family and for the state. If, in this task, the commissioner was uncertain as to her responsibilities, then, for the well-being of the child, it was the commissioner's responsibility to clarify any ambiguities in order to provide the child the care she required and also to be in compliance with the court's orders.

The record reflects that the commissioner sought the care of the child on the ground that the family had failed to follow many of the physicians' and department's recommendations regarding Leah's care. The specific steps the court ordered the department to undertake were, in essence, a reiteration of steps the department had urged on Leah's parents. Once the court issued its orders, the commissioner sought no clarification of them. Our review of the orders leads us to the conclusion that the court's orders provided ample direction to the commissioner.[12]

Incidental to this argument, the commissioner claims that the orders were only aspirational and that she should not be held in contempt for her lack of success in a very difficult matter.[13] Although we agree that the determination of whether the commissioner should be held in contempt should not be measured by her success, we disagree with the characterization of the specific steps ordered by the court as merely aspirational. When the court ordered the department to undertake specific steps on behalf of Leah and her family, the court's orders were directives and not mere aspirations.

To be sure, if the evidence supported the commissioner's view that she reasonably sought to comply with the court's orders and fell short due only to circumstances of Leah's condition beyond her ability to manage, the outcome of this appeal would be different.

---

[12] The commissioner's claim that she did not fully understand her obligations pursuant to the courts' orders is particularly troubling in this instance because the commissioner, in the ex parte motion for temporary custody of Leah, reflected an acute awareness of her needs and her biological family's failure to meet them.

[13] We note that unlike the specific steps ordered in In re Jeffrey C., 64 Conn. App. 55, 779 A.2d 765 (2001), rev'd on other grounds, 261 Conn. 189, 802 A.2d 772 (2002), which were directed toward the parents for the purpose of rehabilitation, in this case, the specific steps were directed toward the department.

Such, however, are not the circumstances that confronted the court. The record in this instance reflects that despite the court's clear direction and the department's awareness of Leah's needs, the department repeatedly failed to take action on Leah's behalf as mandated by the court. Having taken no substantial steps in compliance with the court's orders, the commissioner is in no position on appeal to claim that she has been unreasonably punished for her lack of success in regard to Leah's care.

## II

Next, the commissioner claims that the court abused its discretion by finding her in contempt because there was insufficient evidence in the record to support such a finding. We disagree.

As we have previously stated, "[a] finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in failing to find that the actions or inactions of the [party] were in contempt of a court order." (Internal quotation marks omitted.) *Kennedy* v. *Kennedy*, 88 Conn. App. 442, 443, 869 A.2d 1252, cert. denied, 275 Conn. 902, 882 A.2d 671 (2005).

On the basis of the record before us, we conclude that the court properly exercised its authority to impose punishment on the commissioner for failure to comply with its orders. A fair reading of the specific steps ordered in April, May and October, 2003, in conjunction with the transcripts of the proceedings and exhibits, convinces us that the court correctly determined that the department's actions and inactions constituted wilful noncompliance with the court's orders. As noted, the record reveals that the department was well aware of the specialized needs of Leah and her family when it took Leah into its care in April, 2003. Indeed, as we have previously stated, the commissioner based the

motion for temporary custody of Leah on the determination that Leah's parents had "failed to follow through with the recommended treatment services for Leah," despite its knowledge of Leah's extensive mental health history and Leah's parents' need for assistance with appropriate parenting skills. The department's *own* records, dating back to April, 2003, detail, with specificity, Leah's extensive mental health history, the parents' need for specialized counseling, the need to reunify the family, the danger Leah posed to others and herself, and Leah's urgent need for placement in a therapeutic home or residential facility.

Yet, for the seven months Leah was in the department's care, the department failed to follow the court's orders. The department waited five months before it conducted a psychological evaluation of the family, waited six months before it recommended Leah for residential placement and, for seven months, transferred Leah from one nontherapeutic foster home to the next, to a total of four nontherapeutic foster care placements, where she posed a danger to herself and others.

While Leah was in foster care, the department failed to provide her with mental health treatment,[14] failed to provided her foster parents with adequate support,[15]

---

[14] Although the department did provide Leah with some counseling, its own records show that the counseling sessions were twice a month only, and addressed only her lying and violence toward children and animals. Nothing in the record supports the commissioner's contention that Leah was provided with intensive mental health treatment to address her underlying mental illness. Instead, the record reflects that the department merely provided Leah with behavior modification medication. The record also reflects, in this regard, that Leah's behavioral medication was poorly managed. Leah visited a nurse practitioner to manage her medication only once while in the custody of the commissioner. By November, 2003, her foster parent and mother reported that she appeared to be overmedicated.

[15] At least one of Leah's foster parents requested that Leah be removed from her care, citing the fact that she lacked the support needed to care for Leah.

failed to provide her parents with counseling classes designed to educate them on how to raise children with mental health issues, and made no effort to facilitate counseling between Leah and her brother.[16]

As we have previously stated, wilfulness is a predicate of contempt. *Sablosky* v. *Sablosky*, supra, 258 Conn. 718. "Whether the defendant acted wilfully . . . may be proven by circumstantial evidence. *Jacobs* v. *Crown, Inc.*, 7 Conn. App. 296, 298, 508 A.2d 812, cert. denied, 200 Conn. 805, 510 A.2d 192 (1986). Here, the circumstantial evidence adduced at trial amply supported the court's contempt finding. Accordingly, the court did not abuse its discretion when it held the commissioner in contempt for wilful noncompliance with its orders.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[16] The commissioner maintains that she made no effort to arrange sibling counseling, as ordered by the court in October, 2003, because of Leah's "fragile state," and the commissioner's desire to "stabilize her and maintain her in her relative placement." The commissioner argues that because the court provided no time frame for compliance, her failure to provide sibling counseling services within six weeks cannot be viewed as wilful noncompliance with the court's orders. This claim lacks merit.