# IN RE LEAH S.*
## (SC 17737)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 5—officially released December 18, 2007

*Joseph Rubin,* associate attorney general, with whom were *Susan T. Pearlman,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Tammy Nguyen-O'Dowd,* assistant attorney general, for the appellant (petitioner).

*Susan B. Carr,* for the appellee (respondent mother).

*Opinion*

ROGERS, C. J. In this appeal, we are asked to determine whether certain specific steps issued by the trial court to the department of children and families (department) to facilitate the reunification of a minor child and her parents constitute sufficiently clear and unambiguous court orders so as to support a judgment of contempt. The petitioner, the commissioner of children and families, appeals from the judgment of the Appellate Court, which affirmed the trial court's judgment finding the petitioner in contempt for wilful failure to comply with the trial court's orders that she imple-

ment certain specific steps concerning the care of Leah S., the minor child of the respondent parents, Victoria S. and Joseph S.[1] *In re Leah S.*, 96 Conn. App. 1, 898 A.2d 855 (2006). On appeal to this court, the petitioner claims that: (1) the specific steps issued by the trial court were not sufficiently clear and unambiguous so as to support a finding of contempt; (2) there was insufficient evidence to support a finding that the petitioner wilfully had disobeyed the orders; and (3) the trial court's articulation exceeded the permissible scope of an articulation and must be disregarded on appeal. We conclude that the trial court's orders were not sufficiently clear and unambiguous so as to support a judgment of contempt, and, accordingly, we reverse the judgment of the Appellate Court.

The facts and procedural history relevant to this appeal depict a deeply troubled child. Leah initially was taken into the petitioner's custody on April 9, 2003, pursuant to a ninety-six hour hold after a school counselor reported allegations of abuse and neglect by the respondents. Thereafter, the petitioner filed a neglect petition and sought temporary custody of Leah based, in part, on the determination that the respondents had failed to follow through with recommended counseling services, medication and other services offered by the department, despite Leah's extensive mental health history.

The trial court granted the petitioner's ex parte motion for temporary custody of Leah on April 11, 2003, and issued specific steps to govern the department's care of Leah.[2] The court ordered the department to: "1.

---

[1] We granted the petitioner's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly affirm the trial court's finding of contempt against the petitioner?" *In re Leah S.*, 280 Conn. 911, 908 A.2d 537 (2006).

[2] The trial courts routinely use a preprinted form document, produced by the judicial department entitled "Specific Steps," to issue orders to facilitate the reunification of a minor child, who is in the department's custody, and his or her parents. See General Statutes § 46b-129 (b), (d) and (j); see also

Take all necessary measures to ensure the child(ren)'s safety and well being. 2. Provide case management services. . . . 4. Refer the [r]espondent[s] to appropriate services . . . and monitor [their] progress and compliance. . . ." Thereafter, on May 9, 2003, the respondents consented to the petitioner's temporary custody of Leah, waiving their right to a contested hearing on the order for temporary custody, and the court again ordered the department to take the same specific steps necessary to provide for Leah's needs.

Pursuant to department policy, Leah received a multidisciplinary screening on May 14, 2003. The screening process took into consideration Leah's extensive mental health history, as well as her daily migraine headaches. In the screening report, a social worker recommended that Leah be placed either in therapeutic foster care or in a residential facility due to her mental health needs. Leah remained, however, in a nontherapeutic foster home and the department arranged for Leah to receive counseling from the Wheeler Clinic bimonthly to address her behavioral problems. Although the Wheeler Clinic provided monthly medication management services to Leah, she did not receive psychiatric treatment for her underlying mental illnesses. Leah's specialized needs exceeded her foster families' abilities to care for her adequately and in September, 2003, she entered her fourth nontherapeutic foster home, where the department's reports indicate that she continued to demonstrate aggressive and disruptive behavior.

State of Connecticut Judicial Branch, Official Court Forms, http://www.jud2. ct.gov/webforms/forms/JM106.pdf (current specific steps form document). The form contains check boxes that courts use to issue orders to the parents and a list of preprinted general orders to the department. The form also contains an option marked "other" that the courts may use to issue customized supplemental orders.

The specific steps document in use at the time of the underlying proceedings was JD-JM-106 Rev. 5-99. Although this form has been updated, the specific steps at issue have not changed.

In October of 2003, the respondents and the department reached an agreement concerning the neglect petition whereby the respondents entered pleas of nolo contendere to the allegation that Leah was uncared for due to their inability to provide specialized care to address Leah's mental health needs.[3] The court then committed Leah to the petitioner's custody and ordered the department to comply with the specific steps first issued in April to promote the family's eventual reunification. The court also augmented the orders on the preprinted form by issuing supplemental orders that the department "facilitate counseling between Leah [and her twin sister] to resolve sibling difficulties" and that the respondents "[c]ooperate with child(ren)'s therapy, including sibling counseling, when appropriate." There was no in-court discussion of residential placement for Leah, and residential placement was not enumerated as a specific step.[4]

The Wheeler Clinic recommended residential placement for Leah on October 13, 2003.[5] Meanwhile, Leah remained in a nontherapeutic foster home and the

---

[3] General Statutes § 46b-120 (10) provides that "a child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care that the physical, emotional or mental condition of the child requires."

[4] Neither the parties nor the trial court mentioned residential placement for Leah on the record until the December 19, 2003 hearing on the respondent mother's motion for services, motion to revoke commitment and motion to hold the department in contempt. On that date, the court asked "whether there is agreement between the [respondents] and the department that a residential program would be beneficial for Leah as a transition to return to the home? . . . I just would like to know whether that is an issue . . . ." This dialogue strongly suggests that residential placement was not understood by the court to be incorporated into its specific steps of October 3, 2003. Moreover, the respondent mother did not seek residential placement explicitly in her motion for services.

[5] The Wheeler Clinic's recommendation was the first to recommend *solely* residential placement for Leah; the May, 2003 multidisciplinary screening recommended *either* residential placement or placement in a therapeutic foster home.

department documented Leah's deterioration in foster care, possible overmedication and estrangement from her family, along with a social worker's recommendation that Leah be moved to a safe house or shelter until a residential placement could be made. The department provided other services to Leah during this time, including ongoing treatment with the Wheeler Clinic, a referral to a program to provide support to her foster parents, a consultation with a nurse to address Leah's possible overmedication, and a referral to an extended day treatment program, for which Leah was on a waiting list.

When no residential placement was forthcoming, the respondent mother filed a motion for contempt on November 21, 2003, alleging that, over a seven month period, the department had failed to provide the services necessary to comply with the specific steps ordered by the court, thereby delaying the family's reunification.[6]

After a hearing, the trial court found the petitioner in contempt by memorandum of decision on September 30, 2004, and ordered her to pay $500 to the respondent mother for attorney's fees. The court subsequently issued an articulation on June 1, 2005. In its articulation, the court stated that, despite the department's knowledge that Leah had "entered the system with serious mental health problems" and that she was "uncontrollable, disruptive and sometimes violent," the department nevertheless had failed to implement the specific steps ordered by the court in April, May and October, 2003, by failing to: seek a residential placement for Leah; provide her with psychiatric care for her mental ill-

---

[6] After the motion for contempt was filed, Leah was admitted into a residential facility on or about December 31, 2003, two months after the Wheeler Clinic's formal recommendation. Leah also received a neurological consultation for her migraine headaches and a review of her medications. Moreover, the department began to take steps to facilitate counseling between Leah and her twin sister.

nesses or treatment for her migraine headaches; offer the respondents training on caring for children with mental health issues; and facilitate counseling between Leah and her twin sister.

The petitioner appealed to the Appellate Court from the trial court's judgment of contempt, claiming that she could not be found in wilful contempt of the court's specific steps because the steps were ambiguous and the evidence was insufficient so as to support a finding of contempt. *In re Leah S.*, supra, 96 Conn. App. 8, 12. The Appellate Court affirmed the judgment of the trial court, determining that the specific steps "provided ample direction to the [petitioner]"; id., 11; that, regardless, the petitioner had a duty to seek clarification of any unclear orders, and that the record "amply supported the court's contempt finding." Id., 14. This certified appeal followed.

The petitioner raises three claims on appeal. First, the petitioner claims that the trial court's orders were not sufficiently clear and unambiguous so as to support a finding of contempt because the specific steps document[7] is worded in general terms and both the specific steps and the court's supplemental order conferred broad discretion on the department to determine the appropriate services for Leah. Second, the petitioner claims that there was insufficient evidence to support a finding that she wilfully disobeyed the court's orders because the specific steps did not *explicitly* require residential placement or specific mental health treatment and the department provided other counseling and support services to Leah. Third, the petitioner claims that the trial court's articulation exceeded the permissible scope of an articulation and must be disregarded because the motion for contempt referenced only the specific steps issued on October 3, 2003,

---

[7] See footnote 2 of this opinion.

whereas the trial court in its articulation identified as supporting its contempt order the specific steps issued on April 11, May 9, and October 3, 2003. We agree with the petitioner's first claim, and accordingly, reverse the judgment of the Appellate Court.

"Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense." (Internal quotation marks omitted.) *Wilson* v. *Cohen*, 222 Conn. 591, 596 n.5, 610 A.2d 1177 (1992). In reviewing the trial court's finding of contempt, we are guided by standards that limit our review. "[O]ur review [of a finding of civil contempt] is technically limited to questions of jurisdiction such as whether the court had authority to impose the punishment inflicted and whether the act or acts for which the penalty was imposed could constitute a contempt. . . . This limitation originates because by its very nature, the court's contempt power . . . must be balanced against the contemnor's fundamental rights and, for this reason, there exists the present mechanism for the eventual review of errors which allegedly infringe on these rights. . . . We have found a civil contempt to be improper or erroneous because: *the injunction on which it was based was vague and indefinite* . . . the findings on which it was based were ambiguous and irreconcilable . . . the contemnor's constitutional rights were not properly safeguarded . . . the penalties imposed were criminal rather than civil in nature . . . and the contemnor, through no fault of his own, was unable to obey the court's order. . . .

"Although . . . plenary review of civil contempt orders extends to some issues that are not truly jurisdictional, its emphasis on fundamental rights underscores the proposition that the grounds for any appeal from a contempt order are more restricted than would be the case in an ordinary plenary appeal from a civil judgment." (Emphasis added; internal quotation marks

omitted.) *In re Jeffrey C.*, 261 Conn. 189, 194–95, 802 A.2d 772 (2002). "This limitation originates because by its very nature the court's contempt power, to be effectual, must be immediate and peremptory, and not subject to suspension at the mere will of the offender." (Internal quotation marks omitted.) *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 731, 444 A.2d 196 (1982).

Traditionally, the standards of review for civil judgments of contempt have not been stated explicitly, and we take this opportunity for clarification. Guided by the principles that limit our review, our analysis of a judgment of contempt consists of two levels of inquiry. First, we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. See *Blaydes* v. *Blaydes*, 187 Conn. 464, 467, 446 A.2d 825 (1982) (civil contempt may be founded only upon clear and unambiguous court order); *Dowd* v. *Dowd*, 96 Conn. App. 75, 79, 899 A.2d 76 (first inquiry on review of judgment of contempt for failure to abide by separation agreement was whether agreement was clear and unambiguous), cert. denied, 280 Conn. 907, 907 A.2d 89 (2006). This is a legal inquiry subject to de novo review. See *In re Jeffrey C.*, supra, 261 Conn. 194–97 (conducting, but not specifying, de novo review of whether failure to follow supplemental orders could result in finding of contempt); *Baldwin* v. *Miles*, 58 Conn. 496, 501–502, 20 A. 618 (1890) (conducting, but not specifying, de novo review of whether injunction's language was too vague and indefinite so as to support judgment of contempt); see also *Perez* v. *Danbury Hospital*, 347 F.3d 419, 423–25 (2d Cir. 2003) (reviewing de novo district court's determination that consent decree on which judgment of contempt was based was clear and unambiguous). Second, if we conclude that the underlying

court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding. See *Ramin* v. *Ramin*, 281 Conn. 324, 336, 915 A.2d 790 (2007); *Eldridge* v. *Eldridge*, 244 Conn. 523, 526–27, 529, 710 A.2d 757 (1998); see also *McGuire* v. *McGuire*, 102 Conn. App. 79, 82, 924 A.2d 886 (2007) ("[a] finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in failing to find that the actions or inactions of the [party] were in contempt of a court order" [internal quotation marks omitted]).

We begin with the first level of inquiry concerning the petitioner's first claim on appeal, namely, whether the court's specific steps constituted a court order that was sufficiently clear and unambiguous so as to support an order of contempt. The petitioner claims that the orders were unclear and ambiguous because the specific steps document[8] is worded in general terms, and both the specific steps and the supplemental order conferred broad discretion on the department to determine the appropriate services for Leah and her family. The respondent mother counters that, because the department was in a superior, more experienced position to care for Leah and was well aware of Leah's mental health history, the orders clearly directed the department to provide residential placement, therapy to address Leah's underlying mental health issues, treatment for her migraine headaches and sibling therapy. We agree with the petitioner that the language of the court's orders was not sufficiently clear and unambiguous so as to support a judgment of contempt.

[8] See footnote 2 of this opinion.

"Civil *contempt* is committed when a person violates an order of court which requires that person in *specific and definite language* to do or refrain from doing an act or series of acts." (Emphasis added.) *Merrill Lynch Business Financial Services* v. *Kupperman*, United States District Court, Docket No. 06-cv-4802, 2007 WL 3125231, *2 (D.N.J. October 24, 2007). Whether an order is sufficiently clear and unambiguous is a necessary prerequisite for a finding of contempt because "[t]he contempt remedy is particularly harsh . . . and may be founded *solely* upon some clear and express direction of the court. . . . One cannot be placed in contempt for failure to read the court's mind." (Citations omitted; emphasis added; internal quotation marks omitted.) *Blaydes* v. *Blaydes*, supra, 187 Conn. 467. This is a long-standing tenet of the law of contempt. See, e.g., *Baldwin* v. *Miles*, supra, 58 Conn. 502; 17 Am. Jur. 2d 508–509, Contempt § 137 (2004). It is also logically sound that a person must not be found in contempt of a court order when ambiguity either renders compliance with the order impossible, because it is not clear enough to put a reasonable person on notice of what is required for compliance, or makes the order susceptible to a court's arbitrary interpretation of whether a party is in compliance with the order.[9]

---

[9] The rule that a person must not be found in contempt of an unclear order could, on its face, seem to conflict with this court's statement in *Sablosky* v. *Sablosky*, 258 Conn. 713, 721, 784 A.2d 890 (2001), that "although there may be circumstances in which an ambiguity in an order may preclude a finding of contempt, [w]hether it will preclude such a finding is ultimately within the trial court's discretion. It is within the sound discretion of the court to deny a claim for contempt when there is an adequate factual basis to explain the failure to honor the court's order." (Internal quotation marks omitted.) Despite our broad language in *Sablosky*, our conclusion therein necessarily is limited by the factual and procedural context in which the alleged ambiguity arose. As discussed within the body of this opinion, *Sablosky* concerned a previously clear and unambiguous court order that subsequently became, or was believed to be, ambiguous due to a change in circumstances, and a previously compliant party stopped obeying the order without first seeking judicial clarification or modification. Id., 718–23. In contrast, the specific steps here were unclear from the outset and that

It is well established that when the department takes custody of a minor child, the trial court has the authority to issue specific steps to the department to facilitate reunification with the parents. *In re Devon B.*, 264 Conn. 572, 581–82, 584, 825 A.2d 127 (2003); *In re Jeffrey C.*, supra, 261 Conn. 196; see also General Statutes § 46b-129 (b), (d) and (j).[10] The trial court also may augment the specific steps with supplemental orders. See *In re Jeffrey C.*, supra, 196–97. Concomitant reunification efforts on the part of the parents and the department help to preserve the integrity of the family and are "based on the well settled notion that [t]he right of a parent to raise his or her children [is] recognized as a basic constitutional right." (Internal quotation marks omitted.) *In re Devon B.*, supra, 584; see also *Teresa T. v. Ragaglia*, 272 Conn. 734, 754, 865 A.2d 428 (important goal of child protection statutes to preserve family integrity by providing support services to parents), cert. denied, 546 U.S. 1063, 126 S. Ct. 799, 163 L. Ed. 2d 631 (2005).

lack of clarity conferred broad discretion upon the department to determine what services to provide in caring for Leah.

[10] General Statutes § 46b-129 (b) provides in relevant part: "Upon issuance of an ex parte order [vesting temporary custody of a child in an agency or suitable person], the court shall provide to the commissioner and the parent or guardian specific steps necessary for each to take to address the ex parte order for the parent or guardian to retain or regain custody of the child or youth. Upon the issuance of such order, or not later than sixty days after the issuance of such order, the court shall make a determination whether the Department of Children and Families made reasonable efforts to keep the child or youth with his or her parents or guardian prior to the issuance of such order and, if such efforts were not made, whether such reasonable efforts were not possible, taking into consideration the child's or youth's best interests, including the child's or youth's health and safety."

General Statutes § 46b-129 (d) provides in relevant part: "The court, after a hearing pursuant to this subsection, shall order specific steps the commissioner and the parent or guardian shall take for the parent or guardian to regain or to retain custody of the child or youth . . . ."

General Statutes § 46b-129 (j) provides in relevant part: "The court shall order specific steps that the parent must take to facilitate the return of the child or youth to the custody of such parent. . . ."

The parties to this appeal agree that a trial court's issuance of specific steps generally constitutes a court order and that the failure to comply with such an order may result in a finding of contempt,[11] but disagree as to whether the challenged orders in the present case were sufficiently clear and unambiguous so as to support a judgment of contempt.[12] We conclude that they were not.

The specific steps directed the department to "1. Take all necessary measures to ensure the child(ren)'s safety and well being. 2. Provide case management services. . . . 4. Refer the [r]espondent[s] to appropriate services . . . and monitor [their] progress and compliance. . . ." The imprecise wording of the specific steps gave the department great discretion to provide "necessary measures" and "appropriate services." The specific steps did not define or clarify the meaning of "necessary measures" or "appropriate services" by, for example, specifying whether Leah should have been placed either in a therapeutic foster home or residential treatment facility as opposed to remaining with relatives in a non-therapeutic foster home or whether she should have been treated by a specific type of therapist. In accordance with the language of the specific steps, the department provided services to Leah, including counseling sessions, medical screening and a referral to a

[11] The petitioner conceded at oral argument that the specific steps were a court order that could support a judgment of contempt and agreed that, under certain circumstances, the department would have been in contempt if the language of the specific steps explicitly had ordered the department to place Leah in residential treatment.

[12] The court issued two types of orders to the department, both of which are contemplated by the specific steps form document: (1) the general orders, contained in the preprinted form, directing the department to take all necessary measures to ensure Leah's safety and well-being, provide case management services, and refer the respondents to appropriate services; and (2) the supplemental order that directed the department to provide sibling therapy. See *In re Jeffrey C.*, supra, 261 Conn. 196–97 (distinguishing between specific steps and supplemental orders).

day treatment program. The department also provided services to Leah's foster parents to assist them in caring for Leah. The wording of the inaptly named specific steps simply was not sufficiently clear and unambiguous so as to support a finding of contempt against the department. Cf. *Blaydes* v. *Blaydes*, supra, 187 Conn. 468 (order "clearly and specifically" required payment of percentage of "adjusted gross income" and explicitly defined "adjusted gross income").

The court additionally issued supplemental orders directing the department to "facilitate counseling between Leah [and her twin sister] to resolve sibling difficulties" and ordering the respondents to "[c]ooperate with child(ren)'s therapy, including sibling counseling, when appropriate." The supplemental order requiring the department to facilitate sibling counseling was modified by the court's order that the respondents cooperate with sibling counseling *when appropriate.* No time frame for sibling counseling was established, and the decision as to when to facilitate the sibling counseling was left up to the department's discretion and expertise. Accordingly, because the supplemental order gave the department discretion in providing sibling counseling and failed to provide an explicit time frame or benchmarks for such counseling, the supplemental order was ambiguous and does not support a judgment of contempt.[13]

In upholding the trial court's judgment of contempt, the Appellate Court relied on the principle formulated in *Sablosky* v. *Sablosky*, 258 Conn. 713, 720, 784 A.2d 890 (2001), that, "to the extent that one subject to the

---

[13] Although in this case we conclude that the specific steps and supplemental order could not support a judgment of contempt due to their generality and conferral of broad discretion upon the department, we can envision circumstances where such orders could be more specifically tailored and confer less discretion upon the department so as to support a judgment of contempt. See *In re Jeffrey C.*, supra, 261 Conn. 191.

court's orders does not fully understand his or her obligation pursuant to the orders, it is incumbent on that person or entity to seek clarification of the court's orders." *In re Leah S.*, supra, 96 Conn. App. 9. In *Sablosky*, we reiterated the rule that a party may not resort to "self-help . . . by disobeying the court's order without first seeking a modification . . . ." (Internal quotation marks omitted.) *Sablosky* v. *Sablosky*, supra, 720, quoting *Eldridge* v. *Eldridge*, supra, 244 Conn. 532. We conclude that the Appellate Court's reliance on *Sablosky* and *Eldridge* as support for the contempt finding was misplaced because those cases are distinguishable. In *Sablosky*, the defendant father, who had been ordered to provide financial support to his children while they remained undergraduate students, was held in contempt of a support order when he unilaterally stopped paying educational expenses after one child had reduced her enrollment to part-time and the other had delayed his expected graduation date beyond four years. *Sablosky* v. *Sablosky*, 61 Conn. App. 66, 68–69, 762 A.2d 922 (2000), rev'd, 258 Conn. 713, 784 A.2d 890 (2001). Although the father claimed that he had interpreted the order to mean that he was required to pay educational expenses only if his children were living on campus and enrolled in a full-time, four year program, and that the support order was therefore ambiguous, he was held in contempt of that order nevertheless because he had not sought clarification before stopping payment.[14] Id.; *Sablosky* v. *Sablosky*, supra, 258 Conn. 716. Similarly, in *Eldridge* v. *Eldridge*, supra, 525–26, a former husband was found in contempt when he stopped paying alimony in the belief that his former

---

[14] Moreover, in *Sablosky*, the father *acknowledged* that he was in violation of the court order, was in contempt and should have been ordered to comply. *Sablosky* v. *Sablosky*, supra, 258 Conn. 720. "Th[ose] concessions seriously undermine[d] any contention that the ambiguity entitled the defendant to eschew seeking the court's advice and, instead, to resort to self-help." Id., 720–21.

wife, who had failed to inform him that her earnings had increased, owed him a credit.

This court's decisions in *Sablosky* and *Eldridge* serve to enforce an important public policy against resorting to self-help tactics. "A different conclusion would not only frustrate clearly defined public policy regarding the parental obligation to support minor children . . . but it also would encourage parties to refrain from seeking clarifications of ambiguous court orders. The doors of the courthouse are always open; it is incumbent upon the parties to seek judicial resolution of any ambiguity in the language of judgments." (Citation omitted; internal quotation marks omitted.) *Sablosky* v. *Sablosky*, supra, 258 Conn. 722. Those cases involved, however, situations in which previously compliant parties stopped complying with court orders after changes in circumstances rendered the orders unclear without first seeking judicial clarification or modification. In contrast, the appeal before us is distinguishable from *Sablosky* and *Eldridge* because the specific steps were ambiguous at the outset, and therefore conferred broad discretion on the department to determine which services to provide to Leah. The department, far from employing self-help tactics and stopping services altogether, instead employed the broad discretion conferred upon it by the court in continuing to provide services to Leah.

Although we conclude that the trial court's orders were not sufficiently clear and unambiguous so as to support a finding of contempt, nothing herein should be construed as an endorsement of the department's treatment of Leah, a troubled child removed from the custody of the respondents *precisely because* they were not addressing her severe mental health problems adequately. As the trial court noted in its memorandum of decision, "[the department's] failure to act appropriately and promptly [placed Leah in jeopardy], burdened

foster families, disrespected [the respondents] and imposed unnecessary emotional and financial burdens on them." Though we are compelled to reverse the judgment of contempt against the petitioner, we note nevertheless that the filing of the contempt motion served as an effective catalyst for the department, which shortly thereafter placed Leah in residential treatment, began to facilitate Leah's reunification with her twin sister, and provided enhanced support services to the respondents.[15] Such a catalyst should not have been necessary. For the foregoing reasons, we conclude that the court's orders were not sufficiently clear and unambiguous so as to support a judgment of contempt.[16]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court.

In this opinion the other justices concurred.

---

[15] See footnote 6 of this opinion.

[16] In light of this conclusion, we need not reach the petitioner's remaining two claims on appeal, namely, that the evidence was insufficient to support a judgment of contempt and that the trial court's articulation exceeded the permissible scope of an articulation and must be disregarded on appeal.