******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

THOMAS BROCHARD *v.* BRITT BROCHARD
(AC 38957)

Keller, Prescott and Bright, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff previously had been dis-
solved, appealed to this court from certain postjudgment orders of the
trial court. The defendant previously had appealed to this court from
the judgment of the trial court denying her postjudgment motion for
contempt, in which she claimed that the plaintiff had failed to provide
her with a certain authorization form that would allow her to speak
directly with the bank that held the mortgage on the parties' former
marital home in an effort to avoid foreclosure. This court reversed the
judgment of the trial court and remanded the matter for an evidentiary
hearing on the authorization issue. During the pendency of the defen-
dant's first appeal, the trial court permitted her to pursue the same
contempt motion that was the subject of her appeal. The trial court
adjudicated that motion and various other postjudgment motions that
the parties previously had filed pertaining to financial issues, but which
were not part of the defendant's first appeal. The trial court denied the
defendant's postjudgment motions for contempt, in which she claimed
that the plaintiff had failed to pay his share of medical and extracurricular
activity expenses for the parties' minor children, had violated certain
court orders as to the mortgage on the former marital home and had
failed to pay her one half of certain tax refunds that he had received.
The trial court also denied the defendant's motion to modify the court's
allocation of the parties' payment of certain legal fees for the guardian
ad litem who had been appointed for the minor children. The present
appeal challenged those postjudgment rulings. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's
   motion for contempt, in which she claimed that the plaintiff had failed
   to pay his share of the minor children's unreimbursed medical and
   extracurricular activity expenses; that court correctly determined that
   the parties' parenting agreement, which had been incorporated into the
   judgment of dissolution, required the defendant to consult with the
   plaintiff before she made decisions regarding extracurricular activities
   and nonemergency medical treatment, there was no evidence that the
   defendant indicated to the plaintiff that she had made final decisions
   on medical treatment prior to his acceptance of the services, which
   would have alerted him to trigger a requirement in the parenting
   agreement to address medical bill disputes, and the trial court properly
   denied without prejudice the defendant's contempt motion as it related
   to extracurricular activities, as the testimony was unclear as to whether
   the defendant had complied with the parenting agreement regarding
   notice and prior agreement for the extracurricular activity expenses
   and as to which of those expenses remained unpaid, and it was not
   improper for the court to permit the parties to return to court on the
   issue at a later date.

2. The defendant could not prevail on her claim that the trial court improperly
   denied her motion for contempt in which she alleged that the plaintiff
   had violated certain orders related to the mortgage on the parties' former
   marital home:

   a. The defendant's claim that the plaintiff's failure to execute an authori-
   zation to allow her to speak to and represent him with the mortgage
   loan holder was barred by the doctrine of res judicata, this court having
   considered that claim on its merits and issued a final decision on the
   matter in the defendant's prior appeal to this court.

   b. The defendant's claim that the trial court erred in failing to find the
   plaintiff in contempt of the trial court's orders for his failure to reimburse
   the defendant for four months of mortgage payments was unavailing;
   that court properly determined that the dissolution court had not ordered
   the plaintiff to pay four months of past due mortgage payments and
   interest, and, thus, the plaintiff could not be held in contempt of an
   order that did not exist.

3. The trial court properly declined to hold the plaintiff in contempt for his failure to pay the defendant one half of the tax refunds that he had received from his individual federal and state tax returns for 2010; that court's decision conformed to the clear and unambiguous language of the order in the judgment of dissolution that required the parties to share a refund that would result only from a jointly filed return for tax year 2010.

4. The trial court did not abuse its discretion in denying the defendant's motion to modify the court's order that allocated the parties' obligation to pay the guardian ad litem's fees; the defendant failed to prove that there was a substantial change in circumstances since the court's allocation order that necessitated a reduction in her 20 percent share of the fees, as there was no evidence concerning the amount that might still be owed other than the amounts that the parties claimed were due on their financial affidavits, the defendant provided no evidence of her inability to earn income, and her assets were significantly higher in value than the plaintiff's assets and more than sufficient to pay the debt that she averred she owed to the guardian ad litem.

5. The trial court did not abuse its discretion in granting the plaintiff's motion for a modification of child support and in reducing the plaintiff's child support obligation to $220 per week: that court properly found that $220 per week was the presumptive amount under the child support guidelines and that there had been a substantial change of circumstances as a result of the parties' eldest son having reached the age of majority and graduated from high school, the court's failure to hear the defendant's cross motion for modification of child support as part of its hearing on combined financial issues was not improper, as the defendant never mentioned her pending motion, the plaintiff indicated that he was not prepared to defend against it, and the defendant acquiesced when the court indicated that it had heard everything it was going to hear and that additional arguments could be made in the parties' posttrial briefs; moreover, if the defendant were to reclaim her stale motion for modification, it would likely be moot, as the parties agreed on retroactivity only as to the plaintiff's motion for modification, the defendant would be unable to seek a prospective modification because both minor children had attained the age of eighteen, and the court's entry, upon reconsideration, of a child support order in the amount of $296 per week was not an abuse of discretion, as it was part of the changes that the defendant had requested in her motion to reargue.

6. The defendant's claim that the trial court improperly failed to order the plaintiff to pay her the full amount of past due alimony for 2012 was unavailing; that court corrected an oversight in its initial decision after both parties stipulated that the plaintiff owed the defendant $796.85 for 2012 past due alimony, and that ruling reflected that the defendant was awarded the full amount that she claimed was owed to her.

Argued April 12—officially released October 2, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the Regional Family Trial Docket at Middletown, where the matter was tried to the court, *Gordon, J.*; judgment dissolving the marriage and granting certain other relief; thereafter, the court issued certain orders; subsequently, the defendant filed a motion for contempt; thereafter, the court, *Gould, J.*, declined to rule on a certain issue related to the defendant's motion for contempt; subsequently, the court, *Gould, J.*, denied the defendant's motion to reargue, and the defendant appealed to this court; thereafter, the court, *Gould, J.*, denied the defendant's motions for contempt and for modification of the allocation of the parties' payments of certain guardian ad litem fees, and granted the plaintiff's motion for modification of child support and the defendant's

motion for contempt as to certain alimony payments; subsequently, the defendant filed an amended appeal; thereafter, the court, *Gould, J.*, granted the defendant's motion to reargue and issued certain orders; subsequently, the defendant filed a second appeal with this court; thereafter, the court, *Gould, J.*, modified its order of child support; subsequently, this court reversed the judgment with respect to the first appeal and remanded the case for further proceedings. *Affirmed.*

*Britt Brochard*, self-represented, the appellant (defendant).

*Thomas Brochard*, self-represented, the appellee (plaintiff).

*Opinion*

KELLER, J. The defendant, Britt Brochard, appeals from the postdissolution judgment of the trial court rendered after a hearing on financial issues raised by the parties in multiple motions for contempt and modification.[1] The self-represented defendant's brief is not a model of clarity,[2] but after a thorough review of the record and the parties' briefs, we have divined that the defendant claims that the court erred in (1) denying her motion for contempt alleging that the plaintiff, Thomas Brochard, had failed to pay his share of the minor children's medical and extracurricular activity expenses; (2) denying her motion for contempt alleging that the plaintiff had violated orders related to the mortgage on the former marital home; (3) denying her motion for contempt alleging that the plaintiff had failed to pay her one half of the amounts of 2010 tax refunds he received; (4) denying her motion for modification of the court's order allocating the parties' obligation pertaining to payment of the guardian ad litem's fees; (5) granting the plaintiff's motion for modification of child support, thereby decreasing his obligation, and failing to consider her cross motion for modification, which sought an increase in the amount of child support; and (6) granting her motion for contempt regarding certain alimony payments, but failing to order the plaintiff to pay her the full amount she was owed. We affirm the judgment of the trial court.

The following facts, as determined by multiple judges who have presided over pertinent proceedings in this case, and procedural history are relevant to this appeal. On July 6, 2011, the court, *Gordon, J.*, dissolved the parties' marriage. In its memorandum of decision, the court found that the parties were married on August 27, 1995, in Ridgefield. They have two children, born in 1997 and 1999.[3] The plaintiff initiated the divorce action in 2008, following the parties' separation. The court found that the marriage had irretrievably broken down and issued the following orders relevant to this appeal. It ordered the plaintiff to pay to the defendant child support in the amount of $342 per week, in accordance with the child support guidelines, on the basis of his yearly income of $85,441.72. It also ordered that he maintain medical and dental insurance for the benefit of the minor children if such insurance coverage was available through his employment. Additionally, the court ordered each of the parties to pay 50 percent of all unreimbursed, uninsured health related expenses for the minor children. The defendant was to submit the bill or statement for such expenses to the plaintiff within one week of receipt, and he was to pay it within one week. Each of the parties was responsible for one half of all reasonably incurred extracurricular expenses for the children. The court further ordered that the plaintiff pay to the defendant alimony of $350 per week

until the earliest to occur of the following events: the death of either party, the remarriage of the defendant, June 30, 2021, or as otherwise provided for by law. The court stated that its order was subject to immediate wage withholding. As additional alimony, and subject to the same termination contingencies as the weekly order of alimony, the plaintiff was to pay, quarterly, 30 percent of all gross income earned from wages, self-employment, commissions, incentives, bonuses or other payment plan in excess of $90,000 per year ($22,500 per quarter), but less than $150,000 per year, and 20 percent of any such amounts between $150,000 and $200,000 per year. Every quarter, the plaintiff was to forward to the defendant proof of his earnings for the previous quarter together with any payment due. The court ordered the parties to file a joint tax return for 2010. The plaintiff was responsible for any taxes due and owing for that year, and any refund would be divided equally. The court awarded all right, title and interest in the marital home to the defendant, who would be responsible for all costs associated with the home.

The court also approved and incorporated into the judgment the terms of a parenting agreement between the parties dated March 25, 2011, which established joint legal custody of the children with primary residence with the defendant.

Protracted postdissolution proceedings commenced almost immediately after the court rendered the judgment of dissolution. In setting forth some of the postdissolution procedural history, we rely, in part, on our earlier opinion in *Brochard* v. *Brochard*, 165 Conn. App. 626, 140 A.3d 254 (2016) (*Brochard I*).

"On July 20, 2011, the defendant filed a postjudgment motion for order, alleging that the plaintiff had not made payments on the mortgage on the family home since March, 2011. The mortgage was solely in his name. The defendant requested that 'the plaintiff be required to bring the mortgage current, including all attorneys' fees and other charges.' In the alternative, the defendant move[d] that the plaintiff be required to immediately provide the bank with authorization to speak directly to the defendant, timely file all necessary paperwork in the foreclosure action to allow the parties to participate in the foreclosure mediation . . . attend the foreclosure mediation sessions along with the defendant, and . . . agree to any resolution the defendant comes to with the bank." Id., 629. The plaintiff objected to this motion.

Judge Gordon heard the motion for order, granting it in part and denying it in part, on August 12, 2011. The nature of these orders is discussed more thoroughly in part II A of this opinion.

On February 5, 2013, the plaintiff filed a motion to

modify custody and child support, to which the defendant objected. The plaintiff claimed a substantial change in circumstances making it in the children's best interests for him to have primary physical custody and also sought a modification of his child support obligation. On April 26, 2013, the defendant filed a motion for modification seeking an increase in the child support order. On May 2, 2013, the parties agreed in writing that the plaintiff's motion would not go forward, but further agreed that he could seek retroactivity of any subsequent order(s) regarding child support. That written agreement was approved and made an order of the court. It indicates: "The [plaintiff's] motion to modify child support shall go off with orders retroactive to today. However, the [plaintiff] retains the right to seek retroactivity to the [date of] filing of the motion."[4]

Also on May 2, 2013, as part of the same written agreement the parties agreed that a guardian ad litem would be appointed for the parties' then two minor children. They agreed that the percentage of payment for the guardian ad litem's legal fees would be argued upon completion of some outstanding discovery. Attorney Susan E. Nugent was appointed as guardian ad litem. On May 24, 2013, the defendant moved that the plaintiff be ordered to pay the entirety of Nugent's fees. On February 6, 2014, the court, *Munro, J.*, ordered that the plaintiff pay 80 percent and the defendant pay 20 percent of Nugent's fees. Judge Munro found that Nugent's fees totaled $5400, and that the plaintiff already had paid $2500 toward that amount as a retainer. The defendant had paid nothing despite Nugent's request of a similar retainer from her. The court ordered that the plaintiff would be responsible for $4320 and that the defendant would be responsible for $1080. Both parties were ordered to make payments to Nugent within fourteen days.

On June 16, 2014, the defendant moved for an order reallocating the percentage payment obligations ordered by Judge Munro, alleging that she did not have sufficient income or assets to continue to pay her 20 percent share. The plaintiff objected to the defendant's motion for order and requested that either the defendant pay all of Nugent's fees, or, in the alternative, that the parties continue to pay pursuant to Judge Munro's allocated order.

On April 26, 2013, the defendant filed a motion for contempt with respect to the payment of medical and activity expenses, claiming that the plaintiff had failed to pay his 50 percent share of some of the children's extracurricular expenses and unreimbursed medical and dental expenses, which he was required to pay pursuant to the parenting agreement.

On April 16, 2014, the defendant filed a motion to compel, which supplemented an earlier motion to compel she had filed on March 24, 2014 claiming, inter alia,

that the plaintiff should be ordered to pay her one half of the federal and state tax refunds he had received for the year 2010 and to reimburse her for an estimated tax payment she made that year, which she claimed was ordered by Judge Gordon in the dissolution judgment.

"On November 13, 2013, the defendant filed a motion for contempt, claiming that the plaintiff had violated Judge Gordon's August 12, 2011 order [with respect to the mortgage on the marital home] by, inter alia, failing to execute an authorization allowing the defendant to speak with and represent the plaintiff with the mortgage loan holder, Wells Fargo, as the mortgage has been in the name of the plaintiff solely; said authorization to make [the] defendant the plaintiff's authorized agent for conversing, negotiating, entering into an agreement, all that kind of stuff with Wells Fargo to modify the mortgage loan to avoid foreclosure. Said authorization was to be specific that she has the authority." (Internal quotation marks omitted.) *Brochard I*, supra, 165 Conn. App. 631.

In this contempt motion, the defendant further claimed that she had successfully renegotiated the mortgage loan, cancelled all the late fees and reduced the monthly payments, but that the plaintiff deliberately had interfered and caused the renegotiated plan to be cancelled, thereby forcing imminent foreclosure of the home. She further alleged that the plaintiff had violated other orders of Judge Gordon that he would be responsible for any attorney's fees, interest and/or penalties relating to any foreclosure action on the marital home, that he provide the defendant with any documentation he received from the lender bank, and that he bring the outstanding mortgage on the family home current for the months of March through July, 2011.

"The defendant's motion for contempt [regarding the mortgage] was heard by the court, *Munro, J.*, on November 14, 2013. Judge Munro examined an authorization agreement drafted by the defendant's attorney and asked if the plaintiff consented to it. The plaintiff's attorney replied that he did not, due to language that stated that the defendant would 'have full and complete authority to negotiate, agree and execute proposed settlements with said mortgage[e].' The plaintiff was concerned that this language would permit the defendant to extend the term of the mortgage, thereby further tying up his ability to obtain a new mortgage for a house of his own. The court subsequently told the defendant that 'if he signs something that allows you to negotiate, it should not be something that puts him on the hook for any more liability than he has now. Do you understand that?' The defendant replied that she believed that the intent of Judge Gordon's order was to allow modification of the loan, and that Judge Munro should consult the full transcript containing Judge Gordon's order. Thereupon, Judge Munro stated: 'I'm going to

stop. I hear you. This is a complicated problem. It's not going to be dealt with on short calendar with an audience full of people waiting. I'm going to give you a three day hearing, and this will be rolled into the three day hearing.' Following the short calendar hearing, on November 26, 2013, the plaintiff filed an objection to the defendant's motion for contempt, attaching an authorization form and asserting that 'Judge Munro has already told the defendant that Judge Gordon did not intend that the defendant could expand the plaintiff's exposure under the new mortgage.'

"The case subsequently was transferred to the regional family trial docket. At a hearing on February 6, 2014, regarding the transfer, Judge Munro asked, '[a]ll right, and the motions I sent to regional are motions regarding modification of custody. Any financial motions at all?' The defendant replied: 'A number of financial motions, there's a motion outstanding for contempt on not paying half the children's expenses; contempt on medical expenses; contempt on alimony; [and] contempt on not signing the authorization for me to be able to modify the home.' Judge Munro stated, 'I remember that.' The parties then began discussing the plaintiff's financial disclosure and did not mention the contempt motions further.

"The court, *Gould, J.*, held a hearing on various matters on June 10, 2014. After concluding the custody and visitation portion of the hearing, Judge Gould indicated that he intended to turn to financial issues. The defendant stated that she wished to proceed to the authorization issue. The plaintiff objected stating that he needed a few days to prepare. Judge Gould queried whether the authorization issue was before him or in the foreclosure court. The defendant replied that it was before him, after which Judge Gould stated that they would proceed with outstanding motions on financial issues at a later date.

"The defendant filed a motion for an emergency hearing on August 1, 2014, in which she asserted that the court never returned to the authorization issue. This motion was heard by Judge Gould on September 11, 2014. Judge Gould stated that it was his understanding that there was a ruling that the authorization did not have to be provided. The defendant protested that Judge Munro's ruling indicated otherwise. Judge Gould then stated, 'I'm not indicating [Judge Munro] ruled on [the authorization]. I'm indicating it was ruled on previously; it did not have to be provided.'

"The defendant filed a motion to reargue on October 3, 2014, asserting that Judge Gould's ruling of September 11, 2014, was based on a misapprehension of fact. She contended that Judge Gould incorrectly believed that the motion for contempt regarding the authorization had previously been ruled on. . . .

"Judge Gould considered the defendant's motion to reargue on November 6, 2014. He stated that '[t]his court said there was a prior ruling the authorization for modification of the mortgage would not have to be provided, and I have a specific recollection for issuing that order.' The plaintiff asserted that the issue had been decided by three judges . . . . The defendant asserted that the transcripts demonstrated that the issue had not been ruled on. The plaintiff quoted the statement by Judge Munro that the plaintiff should not be on the hook for more liability. Judge Gould then denied the defendant's motion to reargue with prejudice, noting that she could take an appeal if she chose.' " (Footnotes omitted.) Id., 631–35. The defendant filed an appeal on November 24, 2014.

Despite the pendency of the appeal in *Brochard I*, the defendant, rather than await a ruling by this court, persisted in seeking to have the trial court decide whether the plaintiff was in contempt for violating of Judge Gordon's August 12, 2011 order regarding authorization of a mortgage modification.

The court, *Gould*, *J.*, held a consolidated hearing and addressed all of the foregoing motions. The hearing took place on April 21, April 22, and July 10, 2015. On April 22, 2015, the defendant advised the court that she wanted to pursue the exact same contempt motion that the court had addressed on November 6, 2014, even though it was still the subject of an appeal. Although the plaintiff objected on the ground that this particular issue was still on appeal, the court permitted the defendant to present her claim that although she since had been able to assume the mortgage, the plaintiff was in contempt for not cooperating with her efforts to modify or assume the mortgage, and pursuant to Judge Gordon's August 12, 2011 orders, he was liable to her for costs, including interest, penalties, and fees she had incurred to prevent a foreclosure and eventually reinstate and assume the loan.

On May 28, 2015, the defendant filed an addendum to her motion to modify child support. The court gave the parties three weeks to file additional information regarding the defendant's claim on the tax refund. The parties also were permitted to file posttrial briefs and attach additional "exhibits" to them. At the July 10, 2015 hearing, the court denied the defendant's request to submit additional evidence, but it indicated that it was giving both parties the opportunity to reinforce their positions and arguments in their briefs.

On September 28, 2015, Judge Gould issued a memorandum of decision that included a decision on the defendant's motion for contempt regarding the mortgage. Rather than marking the motion "off," as having previously been decided, he ruled on it. His decision does not reference the statement of Judge Gordon

related to the authorization, but it did note that the plaintiff alleged that " 'the court, *Munro, J.*, has previously ordered that the plaintiff did not have the duty to agree to a mortgage modification that would substantially increase the length of indebtedness to the bank.' [The court's decision also stated] that '[in] his objection, the plaintiff further alleges and provides evidence of a September 1, 2011 letter from his attorney to the defendant [that] enclosed the requested authorization referred to above, and further alleging that the defendant had been directly and actively dealing with the lender since September, 2011.' The decision concludes that 'the recitation of the court's orders and findings made by the plaintiff to be accurate.' The undersigned also finds that the plaintiff provided the subject authorization to the defendant." *Brochard I*, supra, 165 Conn. App. 636.

In addition to denying the defendant's motion for contempt concerning the mortgage on the marital home, in its September 28, 2015 decision, relevant to this appeal, the court granted the plaintiff's motion for modification of child support, granted the defendant's motion for contempt with respect to the payment of certain alimony payments, denied the defendant's motion to compel and to hold the plaintiff in contempt for failing to pay her half of the tax refunds he received for the year 2010, denied her motion to modify the allocation of the payment obligations for the guardian ad litem's fees, and denied her motion for contempt regarding the children's activities and unreimbursed medical expenses.[5]

On October 19, 2015, the defendant amended her prior pending appeal in *Brochard I*, claiming error only in the court's consideration of the mortgage authorization issue. Prior to the filing of this appeal, this court heard oral argument on *Brochard I*. This court issued its decision on May 24, 2016, and reversed the judgment with respect to Judge Gould's conclusion that, due to prior court rulings, the plaintiff could not be held in contempt for failing to provide an adequate authorization. Id., 642. This court ruled that neither Judge Munro nor Judge Gould had ever afforded the defendant an opportunity to be heard on whether the plaintiff's proffered authorization met the requirements ordered by Judge Gordon and that the issue had never been decided. Id., 640. The case was remanded for an evidentiary hearing only on that issue, consistent with our opinion. Id., 642.

Upon returning to the trial court, on November 2, 2016, the defendant, through counsel, filed a motion to reargue/reconsider twelve aspects of the court's decision. After a hearing on the motion to reargue/reconsider on February 11, 2016, the court ruled from the bench on several issues and later, on March 16, 2016, issued a memorandum of decision in which it altered

its modified order of weekly child support payable by the plaintiff from $220 to $296, effective June 19, 2015, after hearing argument from the defendant that the court had made an error in the calculation of the plaintiff's net income. The court also corrected the amount it found that the plaintiff owed to the defendant for past due 2012 alimony, but denied all of the defendant's other requests to reconsider its decision.

This appeal was filed on March 2, 2016. After filing this appeal, the defendant amended her then pending appeal in *Brochard I* to claim that the court erred in denying her motion for contempt relative to the mortgage authorization on September 28, 2015, because it failed to provide her with a full evidentiary hearing; the defendant has raised the identical claim in this appeal. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the court erred in denying her motion for contempt alleging that the plaintiff had failed to pay his share of the minor children's medical and extracurricular activity expenses. Specifically, the defendant claims that the plaintiff owes her $242.50 for his share of nonemergency unreimbursed medical expenses and $2129.13 for his share of activity expenses that he is required to pay pursuant to the parties' parenting agreement of March 25, 2011.

The defendant asserts that the court erred in not finding the plaintiff in contempt because it misinterpreted the parties' parenting agreement, which, thus, requires us to examine that document to ascertain the meaning of the terms contained therein. At the outset, we note that the applicable standard of review requires a two part inquiry. "First, we must determine whether the agreement entered into between the parties in conjunction with the dissolution of their marriage was clear and unambiguous. . . . Second, if we find that the court accurately assessed the intent of the parties regarding the [payment of medical and activity expenses for the minor children], we must then decide whether the court correctly determined that the [plaintiff] had [not] wilfully violated its terms." (Internal quotation marks omitted.) *Dowd* v. *Dowd*, 96 Conn. App. 75, 79, 899 A.2d 76, cert. denied, 280 Conn. 907, 907 A.2d 89 (2006).

Regarding the first inquiry, any agreement, including an agreement that is incorporated into a dissolution judgment is regarded as a contract. Accordingly, our resolution of the defendant's claim is guided by the general principles governing the construction of contracts. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of

the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Lisko* v. *Lisko*, 158 Conn. App. 734, 738–39, 121 A.3d 722 (2015). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007).

The "determination as to whether language of a contract is plain and unambiguous is a question of law subject to plenary review." (Internal quotation marks omitted.) *Perez* v. *Carlevaro*, 158 Conn. App. 716, 722, 120 A.3d 1265 (2015). "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Eckert* v. *Eckert*, 285 Conn. 687, 692, 941 A.2d 301 (2008).

As to the second inquiry, "[a] finding of indirect civil contempt must be established by sufficient proof that is premised upon competent evidence presented to the trial court . . . . A finding of contempt is a factual finding. . . . We will reverse that finding only if we conclude the trial court abused its discretion." (Internal quotation marks omitted.) *Legnos* v. *Legnos*, 70 Conn. App. 349, 352–53, 797 A.2d 1184, cert. denied, 261 Conn. 911, 806 A.2d 48 (2002). To the extent that the defendant challenges the factual findings the court relied on in making its determination that the plaintiff was not in contempt, "we apply our clearly erroneous standard, which is the well settled standard for reviewing a trial court's factual findings." Id., 353 n.2. The defendant, as the party seeking a finding of indirect civil contempt, has the burden of establishing by clear and convincing evidence that the plaintiff violated an order of the court. See *Brody* v. *Brody*, 315 Conn. 300, 318–19, 105 A.3d 887 (2015).

We first examine the language of the parenting agreement. The provisions of the parties' parenting

agreement concerning the children's unreimbursed medical expenses and activities include paragraph 1, which states, in pertinent part: "It shall be the intent of the joint [legal] custody arrangement to allow each parent to have a full and active role in providing a sound social, economic, educational, religious and moral environment for the minor children.[6] To this end, the [defendant] shall consult with the [plaintiff] on all non-emergency matters affecting the health, safety, welfare and education of the minor children, before such decisions involving the minor children are taken. These matters shall include, but not be limited to, such substantial issues as educational programs, camp, extracurricular activities and medical treatment, etc. If the [plaintiff] disagrees on the resolution of the issue, the parties shall seek the assistance of a co-parenting therapist (chosen by the guardian ad litem) in an effort to resolve the disputed issue. . . . The parties shall adhere to the following procedures when dealing with a disputed issue:

"a. After discussion, the [defendant] shall indicate to the [plaintiff] her final decision. The [plaintiff] shall within twenty-four hours, inform the [defendant] that he wishes to trigger the co-parenting therapy requirement.

"b. The [plaintiff] shall make an initial joint appointment with the therapist, said appointment to take place within seven days of the time of his trigger to this provision.

"c. At the conclusion of the initial appointment, and at the recommendation of the therapist, the parties may meet for a second appointment, within seven days.

"If the parties are unable to reach a joint decision after the meeting with the therapist, the [defendant] shall be allowed to make the final decision. The plaintiff . . . may elect to have a court hearing on the issue; however, this shall not delay the [defendant] from making the decision prior to any hearing." (Footnote added.)

Also relevant to the children's activities is paragraph 5 of the parenting agreement, which states, in pertinent part: "The parties shall enroll the children in agreed upon activities for the children and shall share the cost of the same. Consent for the children to participate in an activity shall not be unreasonably withheld."

We first address the defendant's claim that the plaintiff violated his obligation to share equally the cost of the children's unreimbursed medical expenses. The defendant is seeking an order requiring the plaintiff to reimburse her for $42.50 for eye examinations and/or corrective lenses by Shoreline Eye Associates, P.C., and $200 for a psychiatric consultation with a Dr. Paul El-Fishawy. She claims that the court misinterpreted the parenting agreement and thus made an "unwarranted modification" of the terms of the dissolution judgment. The defendant contends that the plaintiff agreed to

these treatments, and even if he did not, the parenting agreement does not require her to notify and obtain the consent of the plaintiff before incurring expenses for nonemergency medical treatment or activities for the children. We disagree.

A plain reading of the applicable provisions in the parenting agreement, according the language its common, natural and ordinary meaning and usage, is that it obligates the defendant to notify the plaintiff of her intent to seek nonemergency medical treatment for the children. Only after the plaintiff has been given prior notice and, after some discussion, indicates that he disagrees, can the defendant make a decision. Once that occurs, the plaintiff has twenty-four hours to inform the defendant that he wants to continue to dispute that decision and trigger the coparenting therapy requirement. If he does so, and the appointment takes place within seven days and the parties are still unable to reach a joint decision, the defendant is then allowed to make the final decision and incur the contested expense, subject to the plaintiff's right to return to court for a final resolution if he so chooses.

The court correctly determined that paragraph 1 of the parenting agreement required the defendant to consult with the plaintiff regarding all nonemergency matters affecting the health, safety, welfare and education of the minor children, *before* any decisions involving the minor children were made by the defendant. These matters included educational programming, extracurricular activities and nonemergency medical treatment. The court found that the record was "replete with [the defendant's] inability, or unwillingness, to communicate with the plaintiff before undertaking any major decisions regarding the [childrens'] care."[7] It further found that crucial e-mail evidence submitted during the hearing showed that the plaintiff did not agree with undertaking the defendant's claimed medical expenses and wanted to research and/or discuss the matter further with the provider and the defendant.

The defendant asserts that the plaintiff should have triggered the coparenting therapy requirement in the parenting agreement to address medical bill disputes, but that provision states: "After discussion, the [defendant] shall indicate to the [plaintiff] her final decision. The [plaintiff] shall within twenty-four hours, inform the [defendant] that he wishes to trigger the co-parenting therapy requirement." There is no evidence that the defendant gave any indication to the plaintiff that she had made her final decisions on medical treatment prior to the defendant's acceptance of the services at issue that would have alerted him that he needed to trigger this requirement.

Essentially, the defendant was putting the cart before the horse, incurring expenses for the children without consulting with the plaintiff and then demanding pay-

ment from him. Although the defendant is correct that the plaintiff must not unreasonably withhold his approval of such expenses, it is not possible to unreasonably withhold approval of an action if one has no notice of it whatsoever or has not had sufficient time to consider it.

We agree with the court's determination that the parenting agreement unambiguously requires the defendant either to obtain the plaintiff's agreement or to have the type of discussion contemplated by the trigger provision before the defendant could incur nonemergency medical expenses for which she would seek reimbursement from the plaintiff. The court did not err in denying the portion of the defendant's motion for contempt regarding her claimed medical expenses.

As to the children's extracurricular activities, the defendant acknowledges that she was required to obtain the plaintiff's agreement prior to enrolling the children in those activities. The court noted that the defendant provided the court with an exhibit that contained a list of activities with a total cost of $2129.13. The court, however, found that the testimony was unclear as to whether the defendant complied with the parenting agreement provisions regarding notice and prior agreement for those expenses and which, if any, of the claimed expenses remain unpaid.[8] In denying without prejudice the portion of the defendant's motion related to the children's extracurricular activities, the court essentially determined that the defendant had not proven contempt of court on the part of the plaintiff by clear and convincing evidence. It also indicated that the parties could return to court on this issue at a later date and provide additional evidence regarding any alleged agreement(s) and/or failures to pay. We agree with the court that the defendant failed to meet her burden to prove contempt, and we conclude that the court was more than fair in leaving the door open for her to make a later attempt at proving her claims as to the activity expenses.

We find no abuse of discretion on the part of the court in denying the defendant's motion for contempt regarding the children's unreimbursed nonemergency medical and activity expenses.

## II

We next address the defendant's claim that the court erred in denying her motion for contempt alleging that the plaintiff had violated orders related to the mortgage on the former marital home. The defendant appeals from the denial of several of her claims in this motion, in which she alleged that the plaintiff had violated Judge Gordon's August 12, 2011 orders with respect to the mortgage on the marital home. In this contempt motion, the defendant claimed that she had successfully renegotiated the mortgage loan, cancelled all the late fees and

reduced the monthly payments, but that the plaintiff deliberately had interfered and caused the renegotiated plan to be cancelled, thereby forcing imminent foreclosure of the home. She further alleged that the plaintiff had violated other orders of Judge Gordon that the plaintiff would be responsible for any attorneys' fees, interest and/or penalties relating to any foreclosure action on the marital home, and requiring that he bring the outstanding mortgage on the family home current for the months of March through July, 2011.

A

We begin with the defendant's claim that the plaintiff failed to execute an authorization allowing the defendant to speak with and represent the plaintiff with the mortgage loan holder, Wells Fargo, as the mortgage has been in the name of the plaintiff solely. For the following reasons, we decline to reach the merits of this claim.

The following additional facts apply to this claim. Shortly after the judgment of dissolution was rendered, on August 12, 2011, Judge Gordon held a hearing on the defendant's motion for an order. The motion for an order requested that the plaintiff be required to bring the mortgage current, including all attorney's fees and other charges. The defendant alleged that the mortgage had gone unpaid since April, 2011. In the alternative, the defendant moved for an order requiring the plaintiff to immediately provide the bank with authorization to speak directly to the defendant, timely file all necessary paperwork in the foreclosure action to allow the parties to participate in foreclosure mediation, attend mediation sessions with the defendant, and agree to any resolution that the defendant came to with the bank.

At the August 12, 2011 hearing before Judge Gordon, the plaintiff's attorney presented an authorization he claimed satisfied the defendant's request. The court rejected this proffered authorization and ruled that in order to effectuate a modification of the mortgage, the authorization "has to say more than converse and negotiate. It has to say that she's his authorized agent for conversing, negotiating, entering into an agreement, all that kind of stuff. I mean, they're not going to let her— they—I mean, it's got to be specific that she has the authority."

As we noted previously in this opinion in setting forth the procedural history of this case, the particular ruling in the court's September 28, 2015 decision on whether the plaintiff ever provided a proper authorization to the defendant in conformity with Judge Gordon's order was recently the subject of a prior appeal, *Brochard I*, in which we reversed the judgment with respect to the decision by Judge Gould for having failed to provide the defendant a full evidentiary hearing on the authorization issue. See *Brochard I*, supra, 165 Conn. App. 641–42.

The defendant successfully argued to this court that Judge Gould had not afforded her an opportunity to be heard on whether the plaintiff's proffered authorization met the requirements ordered by Judge Gordon. This court held that it was improper for Judge Gould to have issued his September 28, 2015 ruling finding that the plaintiff was not in contempt because he had failed to conduct an evidentiary hearing on the defendant's motion despite her request.[9] Id., 641.

This court issued its decision in *Brochard I* on May 24, 2016, and reversed the judgment with respect to Judge Gould's conclusion that the plaintiff could not be held in contempt for failing to provide an adequate authorization. The case was remanded for an evidentiary hearing on the defendant's motion consistent with our decision. Id., 642. There is nothing in the record that shows or even suggests that this hearing has ever taken place. In the context of the present appeal, applying the doctrine of res judicata, we decline to address an appellate claim that this court previously has decided.[10]

We are cognizant of our sua sponte invocation of the doctrine of res judicata and that, generally, res judicata must be specifically pleaded. "This general rule, however, yields when, as here, the circumstances reveal that a remand 'would simply set judicial wheels unnecessarily spinning, only to remain at the same end of the road.' " *Tucker* v. *Pace Investments Associates*, 32 Conn. App. 384, 391–92, 629 A.2d 470, cert. denied, 228 Conn. 906, 634 A.2d 299 (1993), cert. denied, 510 U.S. 1196, 114 S. Ct. 1305, 127 L. Ed. 2d 657 (1994). The circumstances in the present case require us to apply res judicata sua sponte, despite the rule that, generally, it must be pleaded.

"[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose. . . . The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it. . . . Furthermore, [t]he judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest. . . . The conservation of judicial resources is of paramount importance as our trial dockets are deluged with new cases daily. We further emphasize that where a party has fully and fairly litigated his claims, he may

be barred from future actions on matters not raised in the prior proceeding. But the scope of matters precluded necessarily depends on what has occurred in the former adjudication. . . .

"The transactional test measures the preclusive effect of a prior judgment, which includes any claims relating to the cause of action that were actually made or might have been made. . . . A cause of action for the purpose of the transactional test is the group of facts which is claimed to have brought about an unlawful injury to the plaintiff . . . . The fact that a prior judicial determination may be flawed . . . is ordinarily insufficient, in and of itself, to overcome a claim that otherwise applicable principles of res judicata preclude it from being collaterally attacked. . . . If the judgment [in the prior action] is erroneous, the unsuccessful party's remedy is to have it set aside or reversed in the original proceedings. . . . It is well settled that [a] judgment may be final in a res judicata sense as to a part of an action although litigation continues as to the rest. . . . Thus, res judicata may operate to preclude a claim decided in a previous proceeding within the same case. . . . [F]or purposes of res judicata, a judgment will ordinarily be considered final if it is not tentative, provisional, or contingent and represents the completion of all steps in the adjudication of the claim by the court, short of any steps by way of execution or enforcement that may be consequent upon the particular kind of adjudication." (Citations omitted; internal quotation marks omitted.) *Honan* v. *Dimyan*, 63 Conn. App. 702, 706–708, 778 A.2d 989, cert. denied, 258 Conn. 942, 786 A.2d 430 (2001).

The defendant's claim pertaining to the plaintiff's failure to authorize her to speak with Wells Fargo was fully briefed by the parties in *Brochard I*. This court considered the claim on its merits in *Brochard I* and issued a final decision on the matter. The claim is therefore barred by that decision and we will not allow the parties to relitigate the matter in this appeal. See, e.g., *In re Zen T.*, 151 Conn. App. 724, 730, 95 A.3d 1258 (due to application of res judicata doctrine, appellant barred from relitigating claim raised in prior appeal), cert. denied, 314 Conn. 911, 100 A.3d 403 (2014), cert. denied sub nom. *Heather S.* v. *Commissioner of Children & Families*, U.S. , 135 S. Ct. 2326, 191 L. Ed. 2d 991 (2015); *Oliphant* v. *Commissioner of Correction*, 146 Conn. App. 499, 527, 79 A.3d 77 (same), cert. denied, 310 Conn. 963, 83 A.3d 346 (2013); *State* v. *Thomas*, 137 Conn. App. 782, 788–91, 49 A.3d 1038 (same), cert. denied, 307 Conn. 923, 55 A.3d 566 (2012); *Honan* v. *Dimyan*, supra, 63 Conn. App. 705–10 (same).

B

We will address the remaining portion of this claim, which is that the court erred in failing to find the plaintiff in contempt of Judge Gordon's August 12, 2011 orders

pertaining to the mortgage on the marital home by failing to reimburse her for the four months of mortgage payments missed between April 1, 2011 and July 1, 2011. Resolution of this particular claim is not precluded by the doctrine of res judicata because it was not raised in the defendant's prior appeal in *Brochard I*.

In order to resolve whether the plaintiff was in contempt of Judge Gordon's orders of August 12, 2011, a review of those orders is necessary. In reviewing an appeal involving a civil contempt proceeding, "we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review." (Citations omitted.) *In re Leah S.*, 284 Conn. 685, 693, 935 A.2d 1021 (2007).

The defendant claims that Judge Gordon ordered the plaintiff to bring the mortgage payments current for the months of April 1 through July 1, 2011, and that the court erred in not finding the plaintiff in contempt for failure to do so.

The following additional facts and procedural history are necessary to the consideration of this claim. During the hearing before Judge Gordon on August 12, 2011, the court addressed the defendant's motion for clarification, which contained a request that the court answer five questions. In question three, the defendant asked: "[T]he court ordered the marital home transferred to the defendant, who shall be responsible for all costs associated with the home. The mortgage on the marital home is only in the plaintiff's name, and the last payment made by the plaintiff was the March, 2011 payment . . . . Is the plaintiff responsible to bring the debt current before he quitclaims the property to the defendant?"

In question four, the defendant asked: "In paragraph 18, the court ordered the defendant to be responsible for her COBRA benefits.[11] The [d]efendant's health insurance is an individual policy paid monthly. The defendant therefore is not eligible for COBRA. Is the plaintiff responsible for the payments due through July 6, 2011, including the payment due July 1, 2011?" The following pertinent colloquy occurred:

"[The Defendant's Counsel]: And is he responsible to bring the mortgage current?—

"The Court: Right.[12]

"[The Defendant's Counsel]: —Before he quitclaims, which he hasn't done yet.

"The Court: Okay. Is the—the question is, does—is the responsible—yes. The answer to number four is yes. There was a payment due on the first. It was due on the first.

"[The Defendant's Counsel]: Yes, yes. So, he's respon-

sible to—

"The Court: Yes.

"[The Defendant's Counsel]: —make the insurance payment due—

"[The Plaintiff's Counsel]: Well, but that covers the whole month, Your Honor.

"The Court: Was it due on the first?

"[The Plaintiff's Counsel]: It was due on the first.

"The Court: It was due on the first. My decision didn't come out until the sixth.

"[The Plaintiff's Counsel]: Right.

"The Court: That's something . . . I'm not making that determination.

"[The Plaintiff's Counsel]: I didn't hear your answer to number three, Your Honor.

"The Court: *I don't have an answer to number three*—

"[The Plaintiff's Counsel]: Okay.

"The Court: —because it's the same as the problem on the mortgage and whether—

"[The Plaintiff's Counsel]: Okay.

"The Court: —he needs to bring it current." (Emphasis added; footnote added.)

Contrary to the defendant's arguments, it is clear from the previously quoted exchange that, at this point in the hearing, the court had not decided whether the plaintiff should be ordered to bring the mortgage payments missed since April, 2011, current.

A few minutes later, the court indicated: "I've got two issues left, one of which . . . is the mortgage arrearage and who's paying for that . . . ." The court then began a lengthy discussion about the other of the two issues, namely, who was obligated to pay certain other household expenses. At the end of the discussion on household expenses, the court ordered the plaintiff to pay an unpaid household expense arrearage in the amount of $32,438.35 by transferring one half of that amount out of his individual retirement account and paying the other half at the rate of $50 per week. The court then stated: "Oh, I'm sorry. I'm sorry. Hang on for just a second. Let me finish the other order. The request regarding the repayment of the mortgage is denied, for the months to bring it current is denied."

After the court issued this order, it considered the defendant's motion for contempt. The following colloquy occurred:

"[The Defendant's Counsel]: Your Honor, I just, for one moment, just want to address the mortgage issue.

"The Court: Yes.

"[The Defendant's Counsel]: There are unpaid mortgage payments.

"The Court: Yes, I know.

"[The Defendant's Counsel]: That's one thing, but there are attorney's fees that have been incurred because the payments weren't made. All again, in [the plaintiff's] name, and interest because the payments weren't made. All, again, in [the plaintiff's] name. I have e-mails [where the plaintiff] just says it's in foreclosure. That's too bad.

"I mean, I really don't think that those things should be seen the same as the mortgage payments, which I also believe he should pay, but if there are attorney's fees that have been incurred, I can't see how that would appropriately be more penalties or any of that would appropriately be my client's responsibility.

"Again, she's seeking the mortgage payments as well, but I am asking the court to reconsider the idea that the whole kit and caboodle, which might include a couple thousand dollars in attorney's fees, would be my clients' responsibility.

"[The Plaintiff's Counsel]: She had the money to pay, Your Honor. She's liquid. [The plaintiff] was not. When he got a reduction in his income, he was paying 72 percent of his gross income to the defendant. So, he didn't have the money, but she had $400,000 in the account, not including the money she paid back to her father."

The court then proceeded to hear evidence, asking the plaintiff's counsel: "All right, so do you want to put on evidence about when your client first gave her notice that the mortgage was not being paid? . . . Because that goes to the equities of the other fees. I mean, it's one thing to not pay it and say I can't pay it. It's another thing to be silent and let stuff, you know."

After hearing evidence, the court commented: "Once again, the enmity between the two of you has continued. . . . I mean, you're both so adamant about who's right about everything that you just keep, you know, wasting time and money and taking ridiculous positions. [Plaintiff], you owe—you're the only person on the note. If she sat back and did nothing and the house was foreclosed and there was a deficiency judgment, it would all be yours. . . . [I]f you really wanted to protect your credit as much as you say that you do, that people would go about this in an orderly process. On the other hand, [defendant], you said that you're terribly concerned about the roof over your children's heads. Well, yes and no. I mean, you did. You went through, you got all the stuff and everything is going, but you're still arguing about who's going to advance the money or who's going to do what, and it's absurd. Okay? You're living there. You had the liquidity to make the payments.

I mean, I'm not—he hasn't been stellar, and he hasn't made a lot of the payments, and some of it was contemptuous, but he did not have the money to make them all up. Judge Abery-Wetstone's [pendente lite] order was very high, and I think that there—I don't know what everybody was contemplating in terms of the mortgage getting paid, but I already made my order that she's going to take that over, but you're going to be responsible for any attorney's fees, any interest, any penalties, anything else because you could have sat down and instead of threatening . . . a custody fight . . . you could have sat down and said, let's get the papers done for the modification. . . . So, it may be true that you might not have been able to afford to make payments, but your judgment is lacking when it comes to how to solve a problem. Instead of being bellicose, all you had to do is go, great. Let's get the papers done. So, you're going to be responsible for what comes for that delay or that lack of judgment, and that is the attorney's fees, late penalties, reinstatement penalties, *anything but the actual mortgage and interest*. Okay?" (Emphasis added.)

During the hearing before Judge Gould on April 21, 2015, the defendant began the presentation of her motion for contempt on the mortgage issues by advising the court that the plaintiff owed her four months of mortgage payments from April through July, 2011, totaling $7578.88. She argued that Judge Gordon had ordered the plaintiff to pay the past due four months of mortgage payments and that when Judge Gordon stated: "The request regarding the repayment of the mortgage is denied, for the months to bring it current is denied," she only had denied the defendant's request to have the plaintiff pay the August 1, 2011 mortgage payment, but had intended to grant her request for the previous four months, April through July, consistent with her earlier response of "[r]ight," when the defendant's attorney asked: "And is he responsible to bring the mortgage current . . . ." The plaintiff argued that Judge Gordon denied the defendant's request that the plaintiff bring the mortgage current and pay the four months of missed payments.

In its memorandum of decision denying this particular motion for contempt, the court repeated the allegations of each party, and then determined that the recitation of the court's order and findings set forth by the plaintiff were accurate. We interpret this ruling of the court to include a finding that the plaintiff's interpretation of Judge Gordon's order on whether the plaintiff had to bring the mortgage current was correct, and that Judge Gordon did not order the plaintiff to pay the four months past due mortgage payments and interest. Therefore, the court did not find the plaintiff in contempt for failing to bring the April through July, 2011 mortgage payments current.

A review of the entire transcript of the August 12, 2011 hearing leads us to conclude that the court's ruling was proper. Judge Gordon clearly denied the defendant's request that the plaintiff make up the payments missed on the mortgage between April, 2011, and July 6, 2011.

After indicating that "[t]he request regarding the repayment of the mortgage is denied,[13] *for the months to bring it current is denied*," counsel for the defendant began to argue that the court should reconsider its ruling on the defendant's request to bring the payments current while she pressed on to argue that, at the very least, she should recover any additional charges resulting from the default. (Emphasis added; footnote added.)

Shortly thereafter, Judge Gordon spoke to the parties about their unabating mutual animosity and how it was not helping anyone's situation. Her comments further reveal that she did not believe the plaintiff had the ability to pay the mortgage, and therefore determined only to hold him responsible for attorney's fees, costs, and reinstatement penalties emanating from his default, but not for the five months of missed mortgage and interest payments. The court specifically stated: "So, you're going to be responsible for what comes for that delay or that lack of judgment, and that is the attorney's fees, late penalties, reinstatement penalties, *anything but the actual mortgage and interest*. Okay?" (Emphasis added.)

We reject the defendant's interpretation of Judge Gordon's order because her interpretation depends on the artificial isolation of words and phrases that support her position, but fails to take into account the totality of Judge Gordon's remarks. We conclude that the court did not err in declining to hold the plaintiff in contempt on this issue because he cannot be held in violation of an order that does not exist.

III

The defendant's next claim is that the court erred in denying her motion that the plaintiff be held in contempt for failing to pay her one half of the 2010 tax refunds that he received after filing individual federal and state tax returns for 2010.

The following additional facts pertain to this claim. On March 30, 2011, Judge Gordon asked both parties: "Did you all—you're not going to file—you're not filing jointly for 2010, right?" Counsel for both parties responded in the negative.[14] Subsequently, the plaintiff filed his state and federal tax returns as married, filing separately and received refunds, the amount of which are not ascertainable from the record.[15] It is not clear from the record whether the defendant also filed separate returns in 2010. When Judge Gordon rendered the judgment of dissolution on July 6, 2011, subsequent to

the April 15 tax filing deadline, she ordered the parties to file a joint tax return. The plaintiff was ordered to pay any taxes owed, and the parties were to share equally in any refund. This order, which the plaintiff had no reason to contemplate on the basis of the discussion that had taken place in court on March 30, 2011, created another issue necessitating discussion during the August 12, 2011 hearing before Judge Gordon, who advised the parties to consult with an accountant to determine what would happen if a joint return were to be filed in lieu of separate returns. Although the court may have been reconsidering its order pending an accountant's opinion, it did not modify any portion of its dissolution order that obligated the parties to file a joint tax return for the tax year 2010. Despite the fact that this would require an amended return that would not be filed timely, Judge Gordon did not address who would be responsible for any penalties. Ultimately, despite the parties' lack of cooperation for months afterward, Judge Munro finally intervened with an order to end the impasse, and an amended federal joint return was filed, which necessitated further payment to the Internal Revenue Service and resulted in no refund. The defendant, however, contends that because the plaintiff received a generous federal tax refund when he filed separately and had to pay the Internal Revenue Service less than that refund as a result of the jointly filed amended return, he was left with a "net positive," half of which is owed to her.

In its memorandum of decision, the court found that, rather than being entitled to a refund, the parties owed the Internal Revenue Service $2990.74 as a result of filing jointly for the calendar year 2010.

We conclude that the court's decision conforms to the clear and unambiguous language of the order in the judgment of dissolution as to the joint tax refund, which required the parties to share a refund that would result only from a jointly filed return for tax year 2010. The court properly declined to hold the plaintiff in contempt for failing to derive from this simple order an unstated, additional obligation inferred by the defendant but nowhere clearly imposed by Judge Gordon. The defendant's unverified, proposed mathematical calculation may be a fair proposal but, to effectuate it, she first should have sought a revised dissolution order. "[A] court . . . after distributing property, which includes assigning the debts and liabilities of the parties, does have the authority to issue postjudgment orders effectuating its judgment." (Internal quotation marks omitted.) *O'Halpin* v. *O'Halpin*, 144 Conn. App. 671, 677–78, 74 A.3d 465, cert. denied, 310 Conn. 952, 81 A.3d 1180 (2013).

IV

We next address the defendant's claim that the court erred in denying her motion for modification of Judge

Munro's order of February 6, 2014, which allocated the parties' obligation pertaining to payment of the guardian ad litem's fees. The defendant was ordered to pay 20 percent and the plaintiff was ordered to pay 80 percent of the fees owed to Attorney Nugent. The defendant alleged that there had been a substantial change in circumstances since the entry of Judge Munro's order because she was no longer employed and had insufficient assets to pay her share. The court found that there had been no substantial change in circumstances in the finances of either party since the order of February 6, 2014.[16]

"The court may order either party to pay the fees for [a] guardian ad litem pursuant to General Statutes § 46b-62, and how such expenses will be paid is within the court's discretion. . . . An abuse of discretion in granting [guardian ad litem] fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Citation omitted; internal quotation marks omitted.) *Lamacchia* v. *Chilinsky*, 79 Conn. App. 372, 374–75, 830 A.2d 329 (2003).

Both parties filed financial affidavits on July 10, 2015, at the conclusion of the hearing before Judge Gould. The financial affidavits they had filed prior to the hearing before Judge Munro where the 80/20 percent allocation of responsibility was ordered are in the court file. Although the court did not explicitly refer to these affidavits, we presume that it reviewed them in order to ascertain whether there had been a substantial change in the financial circumstances of the parties. At the hearing before Judge Munro, Nugent was owed $2900 and reported that she had asked both parties to pay her a retainer of $2500 each in December, 2013, and that the plaintiff had done so, but the defendant had not. Judge Munro found that as of the date of the hearing, Nugent's fees totaled $5400, and that the plaintiff was responsible for $4320 and the defendant was responsible for $1080. Both were ordered to make their payments within fourteen days.

The defendant's financial affidavit filed on February 6, 2014, reflected a net weekly income of $968.91, weekly expenses of $1905.39, liabilities of $140,175.36 and assets of more than $418,758.68. The plaintiff's affidavit at that time reflected a net weekly income of $1372.02, weekly expenses of $1609.95, liabilities of $36,677.97 and assets of $11,446.33. The defendant filed another financial affidavit on July 10, 2015, indicating a debt owed to Attorney Nugent in the amount of $1333.15, which was based on her 20 percent share. The defendant's net weekly income was $692, her weekly expenses were $2760.70, her liabilities were $153,192.41 and her assets were $474,789. The plaintiff's affidavit, also filed July 10, 2015, reflects his outstanding debt to Nugent as $5332.60. His weekly income was $1596.53,[17] his weekly expenses were $2284.97, his liabilities were

$103,077.46 and his assets were worth $12,771.68.

The court concluded that there had been no substantial change in the financial circumstances of either party since the entry of Judge Munro's order of February 6, 2014, regarding payment of Nugent's fees.[18] "The party seeking the modification has the burden of proving a substantial change in circumstances. . . . To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it. Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstance warrants a modification of the existing order. In making such an inquiry, the trial court's discretion is essential." (Citation omitted; internal quotation marks omitted.) *O'Donnell* v. *Bozzuti*, 148 Conn. App. 80, 87, 84 A.3d 479 (2014).

There was no evidence presented to the court as to what amount might still be owed to Nugent as of July 10, 2015, other than the amounts each of the parties claimed was due to her on their respective financial affidavits.[19] Although the defendant's weekly net income was slightly reduced, she provided no evidence to the court of any inability to seek employment and earn income.[20] There was only a slight increase in the plaintiff's weekly net income, and both parties had significant increases in their liabilities. The defendant, however, in July, 2015, still possessed assets of significantly higher value than the plaintiff's assets, far in excess of her liabilities and more than sufficient to pay the debt she averred she owed to Nugent. We find no abuse of discretion in the court's denial of her motion to reduce her 20 percent allocated share of the fees for the guardian ad litem, an appointment to which she agreed. See footnote 18 of this opinion. There was a reasonable basis in fact for denying the defendant's motion because the defendant had failed to prove a substantial change in circumstances necessitating a reduction in her allocated 20 percent share of the fees.

V

The defendant's next claim is that the court erred in granting the plaintiff's motion for modification of child support, thereby decreasing his obligation, and in failing to consider her cross motion for modification, which sought an increase in the amount of child support. We disagree.

Before addressing the merits of this claim, we note legal principles relevant to motions for modification. First, we set forth our well established standard of review in domestic relations matters. "A trial court is in an advantageous position to assess the personal factors so significant in domestic relations cases, and its orders in such cases will not be reversed unless its

findings have no reasonable basis in fact or it had abused its discretion, or unless, in the exercise of such discretion, it applies the wrong standard of law." (Internal quotation marks omitted.) *Hane* v. *Hane*, 158 Conn. App. 167, 172, 118 A.3d 685 (2015).

When presented with a motion for modification, a court must "first determine whether there has been a substantial change in the financial circumstances of one or both of the parties. . . . Second, if the court finds a substantial change in circumstances it may properly consider the motion and, on the basis of the . . . [General Statutes] § 46b-82 criteria, make an order for modification. . . . The court has the authority to issue a modification only if it conforms the order to the distinct and definite changes in the circumstances of the parties." (Internal quotation marks omitted.) *Barbour* v. *Barbour*, 156 Conn. App. 383, 390, 113 A.3d 77 (2015).

The following additional facts are relevant to this claim. At the commencement of the hearing on April 21, 2015, the defendant advised the court that her motion for modification of child support, seeking an increase retroactive to May 2, 2013, was pending and she wanted it to be heard. She advised the court that she had filed three child support guideline worksheets, one for each of the years 2013 through 2015, along with verification of income. She requested that the court, in ordering child support retroactively, consider the three different time periods. Counsel for the plaintiff responded that although the parties had reached an agreement on May 2, 2014, that agreement concerned only the plaintiff's motion for modification and that no such agreement was made with respect to the defendant's motion for modification seeking an increase in child support.[21]

The plaintiff filed a child support guidelines worksheet that had been prepared in 2013. The plaintiff sought a modification of the $342 per week child support obligation to $277, retroactive to May 2, 2013, and a credit for having overpaid his child support since that date. When the defendant asked the court for an opportunity to respond, the court said: "You don't need to respond to it, ma'am. I understood your argument, and I will review your documentation." Later on, at the end of the hearing on April 22, 2015, the defendant inquired of the court whether it would be hearing *her* pending motion to modify child support. Counsel for the plaintiff responded that he had not seen the defendant's motion, which had been filed on April 26, 2013, so the court told the parties to speak to the presiding judge, *Emons, J.*, as to how to proceed on this motion because the plaintiff was not prepared to go forward on it, or the defendant could come back on some later date when the court would hear the motion. The defendant indicated that she wanted to speak to Judge Emons.

When the parties appeared before Judge Emons on

April 22, 2015, Judge Emons indicated that it was Judge Gould's responsibility to hear all the parties' motions and advised the defendant that Judge Gould was going to hear all motions in this case. Judge Emons did not, however, specify a date on which the defendant's motion for modification of child support would be heard, although she had that authority as the presiding judge.

On May 28, 2015, the defendant filed a document captioned "Defendant's List of Pending Motions for Hearing July 10, 2015. At the very top of this list she noted, "1. Defendant's Motion to Modify—General 4/26/13 MOTION FOR MODIFICATION OF CS 321 JD-FM-174." On that same date, she also filed an "Addendum to Child Support Motion Filed [April 26, 2013]."

At the next hearing before Judge Gould on July 10, 2015, which was more of a "wrapup" session than an actual hearing, the court began by noting that it had "received notification from the parties of potential motions to be heard . . . . I have from the plaintiff that there are no motions pending; counsel, if you have anything else, let me know. I have reviewed from the defendant number 430, which is a further motion to compel . . . 433, which is an addendum to the child support motion, 434, which is a request to provide an update, 435, which is a request to provide an update. . . . In reviewing those documents and in reviewing the motions that have been filed and reviewing the transcripts, my notes and the evidence that has been filed prior to today, I don't think any additional testimony is necessary on those motions."

The defendant then advised the court: "[W]hile [the plaintiff's counsel] gave his child support motion, I was not able to give you evidence, and I have a lot of evidence in conjunction with *that* child support motion." (Emphasis added.) The court advised the defendant that it was not hearing anything further, but that she could make additional arguments and attach any documents to her posttrial brief. There was no clear discussion during this exchange between the defendant and the court that the defendant wanted to be heard immediately on her motion for modification of child support.

The court continued: "Ma'am, the hearing on that issue has already been concluded. I have enough in terms of the amount of information that has been filed. I understand both parties' positions, and you can make any additional arguments and you can attach any documents as exhibits you think are appropriate on the briefs." The defendant responded: "Okay."

In its memorandum of decision, the court did not address the defendant's motion for modification of child support. It granted the plaintiff's motion for modification and reduced his child support obligation to $220 per week, finding that amount to be the presumptive

amount pursuant to the child support guidelines, after finding that the defendant's net income, based on his most recent financial affidavit, was $904.53, and that the defendant was unemployed. The court found a substantial change of circumstances, which was based on the parties' oldest son having reached the age of majority and graduated from high school. The decision makes no mention of any retroactivity of the order to May 2, 2013, and does not award the plaintiff any credit for overpayment since that date.[22] The court made no mention of, and did not rule on, the defendant' motion for an upward modification of child support.

In the defendant's motion to reargue/reconsider, the defendant alleged that the court made an error in determining the plaintiff's net income because the plaintiff should not have deducted his current alimony and support obligation from his gross income, which is not deductible for purposes of calculating the amount of child support due pursuant to the guidelines. The defendant requested that the court adjust the weekly amount up to $296 per week for the one remaining minor child, and the court did so, effective June 19, 2015, in its memorandum of decision on the motion to reargue/reconsider.

As to the court's failure to hear the defendant's motion for modification of child support, we cannot fault the court for not having heard that particular motion as part of its hearing on combined financial issues that began on April 21, 2015, and ended on July 10, 2015. We first note that on February 6, 2014, when Judge Munro inquired of the defendant which motions involving financial issues were to be referred to the regional family trial docket, the defendant never mentioned this pending motion for modification. On April 22, 2015, the plaintiff indicated to the court that he had not seen this motion and was not prepared to defend against it. Finally, in fairness to the court, we observe that the defendant never made any clear reference to her motion for modification on July 10, 2015, and that she subsequently acquiesced when the court indicated it had heard everything it was going to hear and any additional arguments could be made in the posttrial briefs. Because we are unable to conclude that the court actually was put on notice by either Judge Emons or the defendant that the defendant's motion for modification of child support should be heard before the court concluded the financial issues hearing it had commenced on April 21, 2015, we find no error.[23]

As the defendant still may intend to pursue her motion for modification retroactive to May 2, 3013, we will address the retroactivity issue. A review of the written agreement the parties submitted to the court reflects an unambiguous agreement as to retroactivity only on the plaintiff's motion; there is no mention of a pending defendant's motion or any reference to motions

in the plural. Thus, we conclude that if the defendant were to reclaim this exceedingly stale motion for modification, it will likely be moot, as both of the minor children have attained the age of eighteen and she will be unable to seek a prospective modification.[24]

We further conclude that upon the court's reconsideration, it committed no error in granting the plaintiff a modification of child support based on his properly calculated net income and the change in circumstances from the eldest child attaining majority. We find no abuse of discretion in the entry of the $296 per week child support order, effective June 19, 2015. That was part of the numerous changes in the court's orders the defendant requested in her motion to reargue/reconsider.

VI

The defendant's final claim is that the court erred in granting her motion for contempt regarding past due alimony for the year 2012 in that it failed to order the plaintiff to pay her the full amount she was owed. We disagree.

The following additional facts are relevant to this claim, which concerns the defendant's entitlement to provisional alimony, which is additional alimony payable to her on a quarterly basis. Pursuant to the judgment of dissolution, it includes 30 percent of all of the plaintiff's gross income from wages, self-employment, commissions, incentives, bonuses or other payment plans in excess of $90,000 per year, but less than $150,000 per year.

In her testimony of April 22, 2015, the defendant indicated that the plaintiff had sent her a check for $794.45, which represented only a portion of the unpaid provisional alimony payments owed to her for 2012, and that she did not cash the check because she believed that doing so would be an acknowledgment on her part that the plaintiff had fulfilled his entire obligation for that particular time period. In response, the plaintiff's counsel admitted that the plaintiff's check had not been cashed. The evidence reflected that the plaintiff owed the defendant $1802.40 in provisional alimony for 2012.

The defendant argues that the court erroneously awarded her $1005.55 in unpaid provisional alimony despite the fact that the evidence clearly reflected that because she did not cash the check for partial payment, she was actually owed $1802.40.

In its initial decision of September 28, 2015, the court found that the plaintiff had paid the defendant the $794.45. During the hearing on the defendant's motion to reargue/reconsider, however, the court, at the defendant's request, corrected this oversight after both parties stipulated that $796.85[25] was owed by the plaintiff to the defendant for 2012 past due provisional alimony.

Therefore, we interpret the court's ruling to reflect that the defendant was awarded the full amount she now claims was owed to her.

Accordingly, we find no error in the court's granting of the motion for contempt regarding past due alimony.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] On February 6, 2014, at the time the court, *Munro, J.*, referred this matter to the regional family trial docket in the judicial district of Middlesex at Middletown for a hearing on the plaintiff's motion to modify custody and child support, she inquired if any financial motions were also to be referred. The defendant mentioned four motions: a motion for contempt as to the children's expenses, a motion for contempt as to medical expenses, a motion for contempt as to alimony, and a motion for contempt as to the alleged failure by the plaintiff, Thomas Brochard, to sign an authorization for the defendant to be able to modify the mortgage on the parties' marital home. Prior to proceeding on pending financial issues, the court, *Gould, J.*, had conducted a hearing on the custody portion of the defendant's motion for modification of custody and child support in Middletown. At the commencement of the hearing on financial issues on April 21, 2015, which took place before Judge Gould in the judicial district of New Haven and gave rise to this appeal, the defendant provided the court with a list of pending motions that she intended to pursue. The court responded, "I have from you a list of twenty-seven motions, all right. We're not going to hear twenty-seven motions." The plaintiff was pursuing four motions. The court encouraged the defendant to reduce the number of motions she was pursuing and then proceeded in an orderly fashion to address each claimed motion chronologically. Eventually, the court considered and decided ten motions. The defendant continued to file numerous motions after the hearing concluded on July 10, 2015, and demanded that the court also rule on them, filing a document titled, "Defendant's List of Motions to Be Decided," which included a list of "motions filed after hearing."

[2] The plaintiff also is representing himself on appeal.

[3] Both children have since reached the age of majority.

[4] We do not find persuasive the defendant's claim that this agreement also provided her with the right to seek a retroactive modification pursuant to her motion for a modification of the child support order.

[5] The defendant does not appeal from the court's ruling on the plaintiff's motion for modification of custody or its denial of her motion for contempt regarding religious education expenses.

[6] In *Emerick* v. *Emerick*, 5 Conn. App. 649, 656–57, 502 A.2d 933 (1985), cert. dismissed, 200 Conn. 804, 510 A.2d 192 (1986), this court discussed the difference between a sole custodian and a joint legal custodian. A sole custodian has the ultimate authority to make all decisions regarding a child's welfare, such as education, religious instruction and medical care, whereas a joint legal custodian shares the responsibility for all of those decisions. Id., 657 n.9.

[7] In modifying the custody orders, an issue that is not the subject of this appeal, the court stated that "the defendant has repeatedly failed to adhere to her prior agreement to significantly consult with the plaintiff regarding the minor child's matters pursuant to the [parenting] agreement" and removed the sole decision-making authority of the defendant.

[8] The defendant's exhibit containing a list of the children's activities for which she claimed she had not been reimbursed includes confusing notations that some of the expenses had been paid by the plaintiff. She provided little evidence of her having sought the plaintiff's prior approval before she incurred these numerous expenditures. Although the defendant claims that some of her exhibits were "missing" or "falsely marked" as plaintiff's exhibits, she provides no further detail, has made no attempt to rectify the record, and we are unable to ascertain the truth of her assertion from the existing record. A number of exhibits were marked for identification only, but on this issue, the defendant does not inform us which of the exhibits for identification only should have been marked as full exhibits with respect to the medical and activities expenses. From our review of the record, the court admitted almost every exhibit the defendant proffered during the exchange on medical and activity expenses. There also was testimony that despite the children being covered by health insurance through the plaintiff's

employer, the defendant had applied for and was receiving payments for some of their medical expenses from the HUSKY state medical insurance program. Further undermining the defendant's credibility on amounts owed was evidence from the plaintiff that suggested that the defendant had doctored an e-mail exchange between the parties by deleting portions of it to make it appear that the plaintiff had agreed to pay half of Dr. El-Fishawy's bill. The plaintiff also testified that some of the activities the defendant listed to receive half payment were gifts from the child's grandparents, including a drum set and a tuxedo one child needed for an event.

[9] We note that at oral argument before this court in *Brochard I* on February 9, 2016, the defendant acknowledged that she had not filed transcripts of subsequent hearings that occurred in 2015 on the mortgage authorization issue, but she claimed they only would further demonstrate that she had not been provided with a chance to argue her case before Judge Gould issued his September 28, 2015 decision. The plaintiff asserted that Judge Gould's September 28, 2015 decision solely was based on a prior decision of Judge Munro that the plaintiff claimed declared that he did not have to provide the authorization ordered by Judge Gordon. The plaintiff did not claim, despite this court's questioning of the defendant, that any hearing had been held between November 6, 2014, and September 28, 2015, at which both parties were given sufficient opportunity to be heard regarding the authorization issue. See *Brochard I*, supra, 165 Conn. App. 636. Despite the lack of the additional transcripts of all the hearings, we determined in *Brochard I* that the record was adequate for review because the parties represented at oral argument before this court that there was no dispute about whether the trial court addressed the issue on any day for which we did not have the transcript; neither party claimed that any argument or evidence related to the authorization issue, the subject of the first appeal, was heard on those additional hearing days in 2015, and the court's memorandum of decision did not indicate that argument or evidence related to the authorization occurred on those hearing days. Id., 641 n.8. Having now had the opportunity to review these subsequent transcripts for this appeal, however, we determine that both parties, appearing as self-represented litigants, were less than candid with this court during oral argument in *Brochard I* as to whether Judge Gould subsequently had addressed the authorization issue.

[10] Our determination not to address this claim includes the defendant's claim that the plaintiff reimburse her for interest, penalties and fees incurred as a result of the plaintiff's failure to provide her with a proper authorization to negotiate with the mortgage lender because the amounts owed, if any, pursuant to the claim on the mortgage authorization order, may be dependent on whether a proper authorization was provided, and if so, when.

[11] See the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161 through 1168 (2012).

[12] The defendant claims that this particular response is where Judge Gordon ordered the plaintiff to bring the missed mortgage payments current. We disagree because a reading of the subsequent colloquy between counsel and the court reveals that the court reached the opposite conclusion on the defendant's request.

[13] The first part of this statement was denying the plaintiff's request that he be reimbursed for paying the mortgage, pendente lite, from September, 2010.

[14] This does not support the defendant's assertion that Judge Gordon had no idea the plaintiff had intended to file a separate return prior to the entry of the judgment of dissolution.

[15] At the end of the hearing on financial issues on April 22, 2015, the court ordered the parties to provide information regarding what it referred to as the "2010 tax issue and refund issue" within three weeks and that it would keep the hearing open for that three week period of time. No hearing was held three weeks later, and at the next hearing on July 10, 2015, neither party offered any tax documents into evidence. On July 10, 2015, responding to the defendant's ongoing complaint that she was unable to present all of her motions and evidence, the court indicated it was holding the hearing open until July 31, 2015, without stating a purpose for doing so. It further invited the parties to file posttrial briefs and attach additional documents they believed pertinent to their arguments.

This court previously has rejected the use of such a procedure. Although seemingly efficient, it deprives both parties of their right to contest the pertinence of such last-minute, off-the-record submissions. See *IN Energy Solutions, Inc.* v. *Realgy, LLC*, 114 Conn. App. 262, 268–69, 969 A.2d 807 (2009) (court erred in relying on supplemental documentation contained in

supplemental briefs that was not introduced into evidence and no evidence in record supported court's award). The proper procedure would have been for the court to leave open evidence in the hearing, *schedule another hearing date*, and permit the parties to offer additional documents into evidence at that time.

To the extent that the defendant relies on documents she attached to her posttrial briefs to prove she was owed a portion of tax refunds that the plaintiff received from filing individual federal and state tax refunds for 2010, we observe that those attachments are not in evidence, and there is no reference to them or indication in the court's memorandum of decision or in its decision on the motion to reargue/reconsider that it relied on them. We therefore decline to consider any of the defendant's attachments to her posttrial briefs because we cannot presume, as we can with evidence properly admitted during a trial, that the court relied on them.

[16] Despite the defendant's assertions to the contrary, the court did not address whether Attorney Nugent was owed any fees for services she may have rendered between February 6, 2014, and the date of the hearing on April 21, 2015.

[17] We have added back in a deduction the defendant claimed that the plaintiff improperly took on this affidavit for his current child support and alimony obligation in the amount of $692, a sum the court agreed should not have been deducted from his gross income.

[18] The defendant also claims the plaintiff should pay all of the fees for the guardian ad litem and reimburse her for what she has paid because she never wanted a guardian ad litem appointed in the first place. She agreed, however, in writing and in court, on May 2, 2013, that a guardian ad litem should be appointed. We note that, on the basis of the file and after considering the previously noted comments of both Judge Gordon and Judge Gould as to the defendant's tenacity, it would not be fair to say that the need for a guardian ad litem to help resolve parenting issues was caused only by the actions of the plaintiff.

[19] There is a statement from Nugent that was filed in court on July 1, 2014, indicating a total balance due of $12,998.75. This statement reflected that as of June 12, 2014, the plaintiff had paid Nugent $3920 and the defendant had paid her $1080. If the amounts owed to Nugent that are reflected on the parties' financial affidavits of July 10, 2015, are accurate, each of them should have paid Nugent additional sums between February 6, 2014, and July 10, 2015, although neither of them indicated as such during the hearing.

[20] We decline to consider the defendant's self-serving, unsupported assertions as to her lack of an earning capacity contained in one of her three posttrial briefs, which are based on facts not in evidence. See footnote 15 of this opinion.

[21] The May 2, 2013 agreement is in writing, signed by both parties and states in relevant part: "The [plaintiff's] motion to modify child support shall go off with orders retroactive to today. However, [the plaintiff] retains the right to seek retroactivity to the filing of the motion." The agreement was approved and made an order of the court on May 2, 2013.

[22] We conclude that the court did not issue a retroactive order because it would have had to consider any changes in the plaintiff's income between 2013 and 2015 in order to do so, and it refers only to the plaintiff's financial affidavit of July 10, 2015. See *Zahringer* v. *Zahringer*, 124 Conn. App. 672, 688–89, 6 A.3d 141 (2010) (retroactive award may take into account long time period between date of retroactivity and date motion is heard; court may examine changes in parties' incomes and needs during time motion pending to fashion equitable award).

[23] Rather than appealing, the defendant should have reclaimed her motion for modification to the family short calendar in 2015, which would have been a much more efficient way of ensuring it was promptly heard.

[24] The parties' youngest child became eighteen years old in 2016.

[25] There is no explanation given on the record for the $794.45 amount the defendant claimed during the hearing on April 22, 2015, and the stipulated amount of $796.85, a $2.40 differential that favors the defendant.